Argued July 10, Opinion October 25, former decision adhered to, petition
for rehearing allowed June 27, respondents' petition for rehearing
filed March 21, 1978

CITY OF LA GRANDE, *Respondent,*
*v.*
PUBLIC EMPLOYES RETIREMENT BOARD et al,
*Petitioners.*
(TC 22993, CA 5493, SC 25230)

CITY OF ASTORIA, *Respondent,*
*v.*
PUBLIC EMPLOYES RETIREMENT BOARD et al,
*Petitioners.*
(TC 29437, CA 6129, SC 25230)

586 P2d 765

Special counsel for Cities of La Grande and Astoria: Stanton F. Long, Orval Etter, Martha W. Reidy, Timothy J. Sercombe, Johnson, Harrang & Mercer (Eugene City Attorneys); Richard Fischer (Astoria City Attorney); Ross E. Hearing (La Grande City Attorney); James M. Mattis (League of Oregon Cities); John Leahy (Multnomah County Counsel); William Juza (Salem City Attorney); Lawrence R. Derr (Washington County Counsel); Edward Harms, Jr., Harms & Harold (Springfield City Attorneys) on the Petition for Rehearing.

Gary K. Jensen, Eugene, on Response to Petition for Rehearing for Policemen and Firefighters of the Cities of La Grande and Astoria.

James A. Redden, Attorney General, Al J. Laue, Solicitor General, and Jan P. Londahl, Assistant Attorney General, Salem, on Response to Petition for Rehearing for Public Employees Retirement Board of the State of Oregon.

LINDE, J.

Tongue, J., and Bryson, J., separate dissenting opinions.

Howell, J., joins Tongue, J., in his dissent.

**LINDE, J.**

In these cases the court sustained state laws mandating certain retirement and insurance benefits for police and firefighting personnel against claims that the laws unconstitutionally infringed on the cities' powers of self-government. 281 Or 137, 576 P2d 1204 (1978). The Cities of La Grande and Astoria filed an extensive petition for rehearing, and we set the case down for reargument. We reaffirm the constitutionality of the challenged statutes.

*First.* The dispute involves the meaning of the "home rule" amendments added to the Oregon Constitution in 1906, which we repeat here to avoid the inconvenience of referring back to the original opinion. Article XI, section 2, was amended to include the words emphasized here:

> Corporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws. *The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon*[1]. . . .

At the same time, article IV, which had earlier been amended to reserve to the people the statewide powers of initiative and referendum, was further amended to add what is now section 1(5):

> The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and muncipal legislation of every character in or for their municipality or district. . . .

---

[1] The section was further amended in 1910 to add:

[A]nd the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon.

Together, the 1906 amendments provide two grants of power and one limitation of power. Article XI, section 2, grants power to the voters of every city or town to enact and amend their municipal charter. It withdraws power from the Legislative Assembly to enact, amend, or repeal[2] such charters. Article IV, section 1(5), empowers local voters to initiate or to refer to popular vote "all local, special and municipal legislation."

It deserves to be reemphasized that the terms of the granted powers and of the accompanying limitation need not be and are not symmetrical. Much of the argument against these statutes has proceeded as though a constitutional grant of power to one level of government necessarily carries with it a corresponding withdrawal of power from the other. That this is not so has long been a truism with respect to the relationship between the powers of Congress and the states, and it is equally true of "home rule" within a state. It is entirely possible to grant certain powers to local governments to act on their own initiative without at the same time limiting the powers of the state legislature. Indeed, as a practical matter this is essential if local government is to have any authority to legislate on its own in matters in which the state could also act, for otherwise local powers would have to be narrowly confined in order to save room for potential state legislation.[3] The fact that the 1906 amendments gave municipal voters direct constitutional

---

[2]The difference between these clauses with respect to the "repeal" of a charter was noted in *Acme Dairy Co. v. Astoria,* 49 Or 520, 524, 90 P 153 (1907). *See McKeon v. City of Portland,* 61 Or 385, 122 P 291 (1912); *cf.* ORS 221.610-221.660 (1915 act authorizes cities to surrender their charters and disincorporate).

[3] *See, e.g., State ex rel Haley v. City of Troutdale,* 281 Or 203, 576 P2d 1238 (1978) (local building code). The notion of mutually exclusive state and federal powers in the economy proved disastrous to congressional power under the commerce clause in the twentieth century because state legislation had been sustained in the nineteenth century by denying that its subject was within the federal commerce power. Thus *Kidd v. Pearson,*

power to "enact and amend their municipal charter" and to use the initiative and referendum for "all local, special and municipal legislation" was a great achievement for home rule even though these two clauses did not of themselves take anything from the plenary legislative power of the state, for before 1906 these local powers had to be obtained from the Legislative Assembly.

The withdrawal of power from the legislature is found in the other clause of the 1906 amendments quoted above, that "[t]he Legislative Assembly shall not enact, amend, or repeal any charter or act of incorporation for any municipality, city or town." Or Const art XI, § 2. Since the attack in the present cases is on state statutes, we deal with an issue whether the constitution denies the state the power to act, not an issue whether it authorizes local action. There is, of course, no question that La Grande and Astoria could adopt retirement or insurance programs for their employees. The only question is whether article XI, section 2, cut off the legislature's authority to enact statewide standards for such programs.

As we noted in the original opinion, the literal text of article XI, section 2, provides no basis for the cities' position, because their own relevant policies were not in fact stated in their city charters. 281 Or at 150. Petitioners do not purport to point to precise words in article XI, section 2, as denying the legislature's authority to enact these laws. However, the opinion also agreed with petitioners that the limitation expressed in article XI, section 2, should not be read to hinge on whether a city chooses to place a particular policy into its charter or into some other form of

---

128 US 1 (1888), in order to sustain a *state* regulation of a distillery, thought it necessary to hold that manufacturing was not "commerce," thereby seriously undermining later congressional power over nationally important commercial activities such as sugar refining, *United States v. E. C. Knight Co.,* 156 US 1 (1895), and coal mining, *Carter v. Carter Coal Co.,* 298 US 238 (1936).

enactment pursuant to its charter: "It is not the label that matters but the role of the provision in local self-government." *Ibid.*

■■ While declining to "exalt form over substance," however, we found sense in the draftsmen's choice of words that denied the legislature power to enact or supersede municipal *charters* rather than to supersede local enactments of any kind. If the latter were intended, "charter or act of incorporation" would hardly be the way to write it. But the special function of a charter or act of incorporation is that it is needed to organize the local political entity, to establish its governing organs, their selection, their powers and their limits. The charter is the local constitution. The fact that cities, like states, sometimes place merely legislative policies into their charters does not contradict this special constitutive function. "The charter is a grant of power, and the municipality possesses only those properties [*sic*] which the charter confers upon it," the court wrote in 1907, citing earlier cases for this restrictive reading of charter powers. *MacDonald v. Lane,* 49 Or 530, 532, 90 P 181 (1907) (City of Portland could not create an office not provided in its charter). It was against the background of this view of charter powers, granted or denied each city by legislative enactment, that the 1906 amendment withdrew this legislative control over *charters* and left the decisions how to structure and empower their municipal organs to the voters of each city or town.

*Second.* Lacking precise terms in article XI, section 2, that expressly withdraw the power of the legislature to enact these statutes, petitioners invoke the history of the provisions. Specifically, they argue that Justice Harris's opinion in *Rose v. Port of Portland,* 82 Or 541, 162 P 498 (1917), which we quoted in 281 Or at 144-145, confused the explanation given for "home rule" resolutions in 1901 and 1903 with what petitioners describe as the "altogether different" version

actually adopted in 1906.[4] But the differences, which of course were known to Justice Harris and Chief Justice McBride, in no way contradict the *reasons* for the amendment which were stated in *Rose,* and for which we quoted that case.

The version originally proposed by the Legislative Assembly in 1901 and 1903, but not submitted to the voters, was almost three times the length of the one ultimately adopted, mainly because the older version contained detailed procedures for the preparation and adoption of charters.[5] Those procedures were omitted

---

[4]The petition also points out that, according to *Rose* the statement on which *Rose* relied for an explanation of the 1906 amendments was dated September 6, 1906, three months *after* the election at which the amendments were adopted. *See* 82 Or at 560. The cities suggest, therefore, that the statement could not be a reliable source for the purpose behind the amendments. But the 1906 date in *Rose* is a typographical error. The letter actually was dated September 6, 1905.

[5]

SENATE JOINT RESOLUTION NO. 3.

(Of the Twenty-first Biennial Session.)

AMENDMENT TO THE CONSTITUTION OF THE STATE OF OREGON.

*Resolved by the senate. the house concurring:*

That the following amendment to the Constitution of the State of Oregon be and the same is hereby proposed, that is to say, that section 2 of article XI of the Constitution be amended so as to read as follows:

Corporations may be formed under general laws, but shall not be created by special laws. All laws passed pursuant to this section may be altered. amended, or repealed, but not so as to impair or destroy any vested corporate rights.

The legislative assembly, by general laws, shall provide for the incorporation, organization. and classification, in proportion to population of cities and towns. which laws may be altered. amended, or repealed. Cities and towns heretofore organized or incorporated may become organized under such general laws whenever a majority of the electors voting at a general election shall so determine. and shall organize in conformity therewith: and cities or towns heretofore or hereafter organized. and all charters thereof, framed or adopted by authority of this constitution, shall be subject to and controlled by general laws. Any city shall be permitted to frame a charter for its own government consistent with and subject to

the constitution and laws of this state, and for such purpose the legislative authority of such city may cause an election to be had, at which election there shall be chosen by the qualified electors of such city fifteen freeholders thereof, who shall have been residents of such city for a period of at least two years preceding their election, and qualified electors, whose duty it shall be to convene, within ten days after their election, and prepare and propose a charter for such city. Such proposed charter shall be submitted to the qualified electors of such city, and if a majority of such qualified electors voting thereon ratify the same, it shall become the charter of such city, and shall become the organic law thereof and supersede any existing charter, including amendments thereto, and all special laws inconsistent with such charter. Such proposed charter shall be published in [two daily] newspapers published in such city for at least thirty days prior to the day of submitting the same to the electors for their approval, as above provided. All elections in this section authorized shall only be had upon notice, which notice shall specify the object of calling such election, and shall be given for at least ten days before the day of election in all election precincts in such city. Said elections may be general or special elections, and except as herein provided, shall be governed by the law regulating and controlling general or special elections in such city. Such charter may be amended by proposals therefor, submitted by the legislative authority of such city to the electors thereof, at any general election after notice of said submission, published as above specified, and ratified by a majority of the qualified electors voting thereon. In submitting any such charter or amendment thereto, any alternate article or proposition may be presented for the choice of the voters, and may be voted on separately without prejudice to others.

Adopted by the senate February 14, 1901.

C. W. FULTON,
President of the Senate.

Concurred in by the house February 15, 1901.

L. B. REEDER,
Speaker of the House.

Adopted by the senate January 31, 1903.

GEO. C. BROWNELL,
President of the Senate.

Concurred in by the house February 4, 1903.

L. T. HARRIS,
Speaker of the House.

[Emphasis supplied.]

SJR 3, 22nd Or Legis Ass'y, OL 1903 at 346-347. The bracketed words do not appear in the 1901 version of the resolution.

in the 1906 amendment. But, without here repeating in detail the argument set forth in the dissent, the main reliance is placed on the fact that the 1906 version made the authority of cities and towns to adopt their own charters subject, not to the "general laws" of the state as in the first version, but to the constitution and criminal laws of the state.

The argument fails to note to what this change referred. What was it that the earlier version proposed to make subject to general laws? It was the authority of a city "to frame a charter for its own government." And, further bearing out the understanding of the function of a charter discussed above, the amendment before its shortening stated that when adopted by the voters, the charter of a city "shall become the organic law thereof." It was precisely this "organic" or constitutive role that article XI, section 2, attributed to the charter. It was this power of each city "to frame a charter for its own government" that would have been subject to and controlled by state legislation under the first but not under the final version of the amendment. And it is these organic and constitutive powers of self-government that are safeguarded by our interpretation of the amendment.[6]

■ On reargument the state maintains that article XI, section 2, was meant to prevent only special or individual laws dealing with municipal government,

---

[6]It is of no moment that the words "governmental structure," "procedures," or "social and other substantive policies" were not used in 1906, as the dissent argues. These are merely the words we chose to distinguish the function of a "charter of government" or "organic law" (terms which were used at that time to describe the object of article XI, section 2) from general legislation to promote social goals. The need to find a way to describe this distinction did not arise in 1901 or 1906, it arises from efforts to invoke article XI, section 2, to declare such general social legislation unconstitutional when it contradicts a local policy.

The dissent also quotes statements about "home rule" made by proponents and opponents of the further amendment that was adopted in 1910 in order to let city voters decide on prohibition or regulation of the liquor traffic under the state's local option law rather than being bound by the vote in the county. These statements were made by private groups locked in bitter combat over prohibition and were made to win votes for or against the 1910 amendment on that issue.

not laws applicable to all cities generally. In effect, the state takes the position adopted in *Rose v. Port of Portland, supra,* which we declined to revive in our original opinion. It is true that the individual enactment and amendment of city charters by the legislature were the practice against which article XI, section 2, and its contemporary explanations were chiefly directed.[7] Nevertheless, in view of the change from the first to the final version of the amendment, we agreed with the cities on this score. A city's choice of its frame of government in its charter, and even beyond the charter as such, is not subject to general or statewide laws, except for procedural protections of the kind cited at note 15 of the original opinion. With respect to general laws for governmental processes, our opinion reaffirmed the rule of *State ex rel Heinig v. City of Milwaukie,* 231 Or 473, 373 P2d 680 (1962). *See* 281 Or at 146, 576 P2d at 1210.

In an effort to extend this principle from laws concerning city charters to a local option to escape state substantive laws, the cities argue that early

-----

[7] Thus the Portland Oregonian editorialized shortly before the election:

The purpose of this proposed amendment is to take from the Legislature power to enact city charters, and place that power in the hands of the people of the territory to be affected by the act of incorporation. . . .

This is an effort to bring about "home rule" for cities. It is a movement based upon correct principles and aimed at needed reforms. It has the double object of relieving the Legislature of a vast amount of work that it should not be called upon to perform, and of placing in the hands of the people themselves the power to determine the fundamental law of their city government. . . .

The editorial went on to describe the abuses that were common under the system of charter enactment and amendment by legislators, including political trickery, "franchise grabbing," and "plutocratic influences." The Oregonian, May 28, 1906, at 6, col 2.

Apart from political abuse, relief from the voluminous work of special legislation mentioned in the editorial required a means of letting local communities take actions on their own initiative. The 1903 Regular Session of the Legislative Assembly produced 838 pages of special laws compared to 338 pages of general laws. The 23rd Legislative Assembly in 1905 enacted 1135 pages of special laws and 424 pages of general laws in a session which ran only from January 9 to February 17, 1905, the year before the "home rule" amendments were adopted.

charters contained many authorizations for the city to pursue specified social objectives and social policies. But again, there is no disagreement that the cities could after 1906 and can today authorize their governments to pursue such policies. *See, e.g., State ex rel Haley v. City of Troutdale,* 281 Or 203, 576 P2d 1238 (1978).

Moreover, petitioners continue this line of argument by pointing to the analogy of county "home rule" under article VI, section 10, and positing that "matters of county concern," like "municipal legislation" under article IV, section 1(5), extends to "substantive" as well as "structural and procedural" matters. This points up the apparent misunderstanding we wish once more to lay to rest. Petitioners crash through an open door. Of course, local charters are enacted to pursue substantive objectives, not just for their own sake. As the opinion points out, it is precisely because municipalities and the legislature often enact laws "in pursuit of substantive objectives, each well within its respective authority," that the problem of conflict can arise. 281 Or at 148.

We tried again in note 30 to "forestall possible misunderstanding" by stressing that these cases are concerned with the constitutional *limitation* on state legislation stated in article XI, section 2, not with the authority of local communities and voters to act on their own initiative. The limitation stated in article XI, section 2, is only that "[t]he Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town." The opinion holds that this limitation refers to legislative interference with the political arrangements made in local charters and "charter-like" provisions but does not invalidate general social, economic, or other regulatory statutes merely because they contradict local policies. This holding concerns only the constitutional limits on the state legislature; it does not concern what may be done under local authority granted by charter, statute, or "municipal legislation" under article IV, section 1(5), as petitioners appear to fear.

The constitution shows, however, that beyond the limitation on enacting, amending, or repealing charters the legislature did not lose the power to enact purely local laws. Article IV, section 23, lists the specific kinds of special or local laws that are forbidden. And article IV, section 1(5), the "home rule" section, itself provides that a referendum by the qualified voters of each municipality or district may be invoked against such local or special laws, those made by the legislature as well as those enacted by local governments. *See Rose v. Port of Portland,* 82 Or at 573; *Wasco County P.U.D. v. Kelly,* 171 Or 691, 699, 137 P2d 295 (1943).[8] If the "home rule" amendments had made the enactment of local laws by the Legislative Assembly unconstitutional it would obviously be neither necessary nor even proper to invoke the referendum against such laws.

*Third.* The petitioners and the dissent argue that the distinction between legislation invading a municipality's "charter of government" or "organic law" and legislation for general social goals will not free the state and the cities, and ultimately this court, from making difficult legal decisions.[9] Of course, it will not.

---

[8]This understanding is also shown by a pamphlet circulated by the People's Power League in 1906 supporting adoption of the "home rule" amendments. The pamphlet stated that adoption of the amendments would give "COMPLETE HOME RULE to the voters of every county, city and town, through the local application of the initiative and referendum to all purely local business, including CITY CHARTERS to be enacted and amended by each city for itself, LOCAL LAWS AND FRANCHISES passed by the legislature, and ORDINANCES, RESOLUTIONS AND FRANCHISES passed by city councils and county courts; . . ."

In other words, the proponents of the amendments had no notion that the amendments were to withdraw the constitutional authority of the legislature to make local laws other than the authority to enact, amend, or repeal charters. They relied on the political process of the referendum to maintain local popular control over such laws.

[9]The distinction between issues of substantive and procedural law in such legal areas as conflicts of law or retroactivity, referred to in the dissent, is not analogous. Here we distinguish between legislation setting social goals for the state and its communities, laws prescribing what is to be accomplished, from laws prescribing the organization and processes of city government which alone are "amendments" of city charters as we have

We will not repeat here all we said on that point in our first opinion, 281 Or at 147-148, 153-154. But those legal decisions will be made by identifiable criteria, derived from the constitutional command to the legislature to let local voters choose their own modes of government. They will not depend on the court's reweighing the benefit-cost ratios of competing social demands, which is the very substance of politics.

Petitioners propose that this weighing of "local" against "statewide" interests could be made on a record of evidence taken in trial courts, including statistics, expert testimony, and the like. The suggestion demonstrates the flaw of "balancing" rather than resolving it. This approach would make the constitutionality of a statute depend, not on what kind of laws article XI, section 2, means to withdraw from the legislature, but on the capacity of litigants in a particular case to "prove" the value of the statute to the state as compared with the value of the competing policy to the city. But such a trial record might look different in a case from La Grande from the record in a case from Astoria, and settle nothing for Eugene, or Portland, though the statute is enacted for the whole state. A law that was sustained on one record in 1978 could be attacked again on different "proof" of the competing interests offered by different parties in 1979. And the ultimate dispute is over policy, even when the facts are undisputed. Nothing in article XI, section 2, supports such an approach to a trial of competing interests before the court.

Alternatively, petitioners propose that the legislature be required to state "findings" and "reasons" for imposing a statewide policy which could be contested in a trial on judicial review. The proposal misconceives

interpreted article XI, section 2. Indeed, substantive laws not addressed to local governments at all but to private persons have sometimes been improperly attacked under these constitutional provisions. *See State ex rel Haley v. City of Troutdale,* 281 Or 203, 208-209, 576 P2d 1238, 1241-1242 (1978).

the position of the Legislative Assembly in the constitutional scheme. The legislature is a body of politically accountable, policy and lawmaking representatives of the people of the state, not a factfinding agency. The value of recitals of legislative findings and justifications in statutes is a matter of disagreement.[10] If constitutionality hinged on such recitals, it would become a game for draftsmen obliged to anticipate whatever might impress a future court; moreover, the suggestion does not state whether the recitals in the statute should be judged as of the time of the statute's enactment or the time and place of its application. In any event, their use is a matter of legislative choice.

■ Finally, the petition for rehearing debates only the general tenor of the opinion in this case. It does not address the question actually at issue, the validity of the retirement and insurance requirements enacted in the 1971 statute. We reaffirm the constitutional validity of the statute.

**TONGUE, J.,** dissenting.

My reasons for dissent may be summarized as follows:

1. The majority would ignore the fact that all parties, including the State of Oregon, the cities of Oregon, and the unions representing Oregon policemen and firemen have rejected the distinction adopted by the majority for application of the Home Rule amendments between cases involving the "structure and procedures" of city government (in which cities would retain some limited measure of exclusive home rule power), and cases involving matters of "substantive policy," (in which, under the newly adopted rule of "legislative supremacy," the legislature can supersede provisions of city charters or ordinances).

---

[10] *See, e.g.,* the discussion of the National Conference of Commissioners on Uniform State Laws quoted in F. Newman and S. Surrey, Legislation 590-595 (1955). *See also* R. Dickerson, Legislative Drafting § 9.1 (1954).

2. The attempt by the majority to find "identifiable criteria derived from constitutional command" to support that distinction between "procedures" and "substance" by reference to the word "charter" in the Home Rule amendments is demonstrably without merit.

3. That same distinction is also inconsistent with the legislative history of the Home Rule amendments, as conceded by all parties to the case.

4. The newly adopted "procedure—substance" distinction will create more problems than it will solve and will not enable this court to decide Home Rule cases by the application of "identifiable criteria, derived from constitutional command," as claimed by the majority.

5. The majority opinion will strip Oregon cities of most exclusive "home rule" powers, including the power to determine the compensation to be paid to their own employees, and will subject cities to control by the state legislature in all matters involving "substantive policy," including liability for payment of financial burdens resulting from social programs mandated by the state legislature.

I. *The previous majority opinion.*

In considering the opinion by the majority which "reaffirm(s)" the constitutionality of the challenged statutes it is first important to bear in mind that the majority would not only reaffirm the result reached by its previous majority opinion, but would also reaffirm the new rule of "legislative supremacy" as stated in that opinion, including the basis for that rule in the newly recognized distinction between matters of "the structure or procedures" of "government" and matters of "substantive policy."[1]

---

[1] That distinction is as follows:

(1) As to matters involving the "structure and procedures of local government agencies," cities would retain local autonomy, subject, however, to an important exception in any case in which a "state concern" is "justified by a need to safeguard the interests of persons or

It is also important to bear in mind that the result of the adoption of that rule, based upon this distinction, is not only to affirm the validity of the current statute requiring cities to provide insurance policies and retirement benefits to policemen and firemen in accordance with the requirements of the state Public Employes Retirement System, but to hold that under that rule the legislature is empowered to impose upon cities the financial burden of payment of these or other benefits to *all* city employees, including all clerks, janitors and street cleaners, and in *amounts* as required by statute, and to provide by general laws that cities must conform to requirements prescribed by the legislature as to any and all substantive matters that it may choose to impose upon cities.

The importance of recognizing the broad sweep and the needless "overkill" of the previous majority opinion is emphasized by the fact that at the argument on rehearing the attorney representing the cities conceded, in response to a question, that these statutes involving policemen and firemen might be valid even under the test as previously established and recognized by unanimous opinions of this court for a period of over 40 years.[2] The primary concern of the cities is not so much the result in this case, but the result that would be required in future cases by the adoption of a new rule of "legislative supremacy" under which the state legislature may overrule provisions of city charters and ordinance provisions as to matters of "substantive policy" and also as to any matter involving

entities affected by the procedures of local government." (281 Or at 156)

(2) As to matters involving "substantive social, economic or other regulatory objectives of the state," a state statute will prevail over any local law whenever it appears that the legislature "clearly intended [it] to do so," subject to an exception in the event that a state statute is "irreconcilable with the local community's freedom to choose its own political form." (281 Or at 156)

[2] *See* cases cited in previous dissenting opinion in this case, 281 Or 137, at 189, 576 P2d 1204 (1978).

the "structure and procedures" of local government in which there is a need to "safeguard the interests of persons or entities."

## II. *Reasons for requesting reargument and concessions made on reargument.*

The new rule of "legislative supremacy" as adopted by the previous majority opinion, including, in particular, the distinction between matters of the "structure and procedures" of local government and matters of "substantive policy," was attacked by a petition of the cities for a rehearing. That petition undertook, for the first time, to set forth the legislative history of the Home Rule amendments and to demonstrate that the distinction which was the basis for the majority opinion was inconsistent with that legislative history.[3]

This court then called for reargument of the case, based upon a letter to the parties requesting argument on two specific questions.[4]

---

[3] Because on trial and on the original appeal all the parties had agreed that the case was controlled by the test of "predominant interest," as previously stated in State ex rel Heinig v. Milwaukie et al, 231 Or 473, 373 P2d 680 (1962), and because the cities could not have foreseen the adoption of new rules based upon such a "procedure-substance" distinction, there had been no previous occasion to consider that legislative history.

[4] These questions were as follows:

"1. *Whether the distinction* made by the majority opinion between matters involving 'the structure and procedures of local agencies' and matters involving 'substantive social, economic or other regulatory objectives of the state' is a distinction which *is consistent or inconsistent with the terms and legislative history* of the home rule amendments considering, among other things, SJR No. 3 of 1901 and 1903, the letter of September 6, 1905, by the sponsors of the amendments, the changes then made in the provisions in the proposed amendments, any arguments by sponsors or opponents of those amendments, the contemporaneous history of the Oregon 'local option' law; (see Hall v. Dunn, 52 Or 475, 486, 97 P 811 (1908)); and the subsequent amendment of Art XI, §2, in 1910, including arguments by sponsors and opponents of that amendment.

"2. *What, if any, other reasons there may be in support of or opposition to the making of that same distinction, including what, if any, problems may result* from the application of that distinction in future cases such as cases involving charter provisions or ordinances adopted by cities relating to land use planning. See for example ORS

[ 189 ]

It is of interest that the opinion by the majority makes no reference either to that request or to those questions, which provided the basis for reargument of the case and stated the questions which presumably were of primary concern to the court in calling for reargument.

Of even greater significance is the fact that the majority opinion would completely ignore important, if not vital, concessions made by all parties at the time of the oral argument. Thus, not only did the cities contend, as in their petition for rehearing, that the distinction between matters of the "structure and procedures" of local government and matters of "substantive policy" was inconsistent with the legislative history of the Home Rule amendments, but both the attorney representing the State of Oregon and the attorney representing the policemen and firemen unions specifically conceded this point in response to questions on oral argument. None of these parties supported the adoption of that distinction, which is the basis for the majority opinion.

In addition, the attorney for the state conceded, in response to a question, that in cases involving matters of the "procedures of local government" the application by this court of the exception permitting "legislative supremacy" even in such cases upon the showing of a "need to safeguard the interests of persons or entities" would require this court to make "political decisions" to the same extent as now required under the "predominant interest" test of *Heinig.*

No one reading the majority opinion would be informed of these important facts.

III. *Language of the Home Rule amendments.*

The majority opinion (at 177) is critical of the cities for their failure "to point to precise words in article XI,

197.175 and 227.020 et seq., and Fifth Avenue Corp. v. Washington County, 282 Or 591, 581 P2d 50 (1978), decided June 20, 1978." (Emphasis added)

section 2, as denying the legislature's authority to enact these laws." The majority then purports to find "precise words" in Art XI, § 2, providing "identifiable criteria, derived from constitutional command" to support its contention that the Home Rule amendments, although granting certain powers to the voters of cities, did not limit the power of the legislature except with reference to provisions of charters relating to "organic and constitutive powers of self-government," i.e., "structure and procedure" of local government, as distinct from provisions of charters and ordinances relating to matters of "substantive policy." In other words, the majority now purports to find in the reference in Art XI, § 2, to "charter" a basis in "precise words" to support the distinction made by the previous majority opinion between matters of "structure and procedure" and matters of "substantive policy." No such contention was made by the majority in its previous opinion, nor by any party at any time.

With all due respect, it is submitted that this new analysis is fatally defective for the following reasons:

(a) The majority assumes that because a charter is the "constitution" of a city, the reference in Art XI, § 2 to "any charter" must be taken as meaning only those provisions of a city charter relating to its "organic and constitutive powers of self-government."

The opinion concedes (at 177-78), as does the original majority opinion (281 Or at 150), that an ordinance adopted validly under the provisions of a charter has the same status as a charter insofar as the limitation of Art XI, § 2, is concerned. The opinion also concedes that just as a constitution may include provisions relating to substantive policy a charter may also include such provisions, but assumes that the reference in Art XI, § 2, to "charter" excludes any such provisions.

This assumption is not only without foundation in any language of Art XI, § 2, but is contrary to historical experience. The Constitution of the United

States includes its Bill of Rights, which surely relates to matters of "substantive policy." Who is to say that the provisions relating to due process, self-incrimination, search and seizure are of less importance than provisions enumerating the powers of Congress? Similarly, the very first article of the Constitition of Oregon is a "bill of rights."

There are no "precise words" in Art XI, § 2, which demonstrate that in the use of the term "charter" it was intended to include only those provisions of a city charter or ordinances relating to matters of the "structure or procedures" of city government and to exclude provisions of charters and ordinances relating to matters of "substantive policy." If there is any doubt as to the correctness of this conclusion, any such doubt is removed upon consideration of the legislative history of Art XI, § 2, which all parties concede to be inconsistent with any such distinction.

(b) According to the majority opinion (p 178) a charter is a "*grant of power*," and the "special function" of a charter, among other things, is "to establish its governing organs, their selection, *their powers,* and their limits." One of the most common and essential powers conferred upon the "governing organ" of a city is the power to set the compensation for all city employees.

*It follows that for the majority to hold that the legislature may adopt a statute which purports to limit this commonly recognized and essential power of the "governing organ" of a city is to hold that the legislature may amend the provisions of the charter of a city which grant such powers to its "governing organ."* Thus, upon recognizing that one of the primary functions of the charter of a city is to set forth the powers of its "governing organ," the majority must also recognize that because Art XI, § 2, provides that the legislature cannot amend any city charter, that prohibition extends to the provisions of a charter conferring powers upon its "governing organ," including the power to set the compensation for all city employees.

The previous majority opinion viewed a state statute requiring payment of pensions to policemen and firemen as one "addressed primarily to substantive social, economic or other regulatory objectives of the state," rather than as a statute "addressed" to the "structure or procedures" of city government. (281 Or at 156) The direct effect of such a statute, however, is to "amend" the charter provisions of cities which grant to their "governing organs" the power to control the compensation paid to all city employees, including "fringe benefits" of pensions and insurance. This, according to the new rationale by the majority, would be contrary to the express prohibition of Art XI, § 2. Thus, as stated by the majority opinion (at 178):

"* * * [T]he 1906 amendment withdrew this legislative control over *charters* and left the decisions how to structure *and empower their municipal organs* to the voters of each city or town." (Emphasis added)

(c) The terms of Art XI, § 2, expressly provide that the power of voters of cities to adopt charters (and, by implication, ordinances, as conceded by the majority opinion) is subject to the constitution and *criminal* laws of the State of Oregon. This express reference to *criminal* laws demonstrates that the limitation imposed by Art XI, § 2, upon the power of the legislature was not confined to charter provisions and ordinances relating to matters of "structure and procedures" of local government, but extended to charter provisions and ordinances relating to matters of "substantive policy."

This is clear because there is little, if any, possibility of conflict between a charter provision or ordinance relating to the "structure or procedures" of city government and a state criminal law. On the contrary, it is when a city charter or ordinance involves a matter of substantive policy, such as "local option" (as discussed below), that there may well arise a possibility of conflict with a state criminal law.

The construction as now adopted by the majority might be otherwise plausible if the Home Rule

[ 193 ]

Amendments had provided that the state, by *"general"* *law,* could supersede any charter provision or ordinance relating to a matter of substantive policy. As discussed below, however, that term was deliberately rejected and was replaced by the term "criminal law," which has primary, if not exclusive, application to charter provisions or ordinances relating to matters of "substantive policy."

(d) The majority also ignores the provisions of Art IV, § 1(5), which expressly confer upon voters of cities the powers of initiative and referendum as to "*all local,* special and municipal *legislation of every character* in or for their municipality or district." Under the majority opinion, there would be two possible results in the application of this constitutional amendment, which was adopted at the same time as Art XI, § 2. These are as follows:

(1) That by reason of Art IV, § 1(5), the legislature could not override a charter provision or ordinance adopted by initiative or referendum, even though relating to a matter of "substantive policy," because it would fall within the term "local * * * and municipal legislation of every character," but could nevertheless set aside any charter provision or ordinance *not* adopted by initiative or referendum on the same subject. Obviously such a result would make no sense.

(2) That by reason of Art IV, § 1(5) voters of cities would have exclusive power by initiative and referendum to enact charter provisions or ordinances relating only to matters involving the, "structure or procedures" of city government (in the sense that such a provision would not be subject to legislative veto), but would not have such exclusive power to enact a charter provision or ordinance relating to a matter of "substantive policy," which could be "vetoed" by the legislature. Such a result would make no more sense because Art IV specifically extends to "all local * * * and municipal legislation of every character."

[ 194 ]

For these reasons, the attempt by the majority to find in the word "charter" a "precise" word providing "identifiable criteria derived from constitutional command" to support its distinction between matters involving "structure and procedure" and those involving matters of "substantive policy" is demonstrably without merit. How much more realistic it would be to focus instead upon the words "local * * * and municipal legislation of every character," as stated in Art IV, § 1(5), as the words which state the intended scope of the exclusive Home Rule powers granted by these two amendments. As next discussed, this conclusion is reenforced by consideration of the legislative history of the Home Rule amendments, which demonstrates that the sponsors of those amendments claimed no more than that they conferred Home Rule powers as to all "local" matters, although they claimed "complete home rule" as to all local matters.

## IV. *The legislative history.*

As previously stated, all three parties, including the cities, the State of Oregon and the unions, agreed at the time of oral reargument that the distinction in the previous majority opinion between matters involving the "structure and procedures" of city government and matters involving "substantive policy" is inconsistent with the legislative history of the Home Rule amendments.

First, and of primary importance, is the "historical fact" that the original draft of Art XI, § 2 (SJR 3, as adopted by the legislature in 1901 and 1903), would have provided that all city charters "shall be subject to and controlled by *general* laws," whereas the amendment, as finally adopted, provided that the power to enact city charters is subject only to the constitition and *criminal* laws of the state. This change was made after circulation of the original proposal by a letter dated September 6, 1905, requesting "suggestions and criticisms" of its "language." This, in my opinion, is convincing evidence of an intent by the sponsors of the

[ 195 ]

initiative measure, as submitted to the voters in 1906, to reject the proposal by the legislature that city charters adopted under the Home Rule amendments would still be subject to "general laws" of the state.

The majority would, in effect, reinstate the provision making such charters subject to general laws of the state as to all matters involving "substantive policy." According to the majority, this would include the power of the state by general laws to supersede powers granted in a city charter to determine the compensation payable to all city employees. The only answer by the majority to this contention is to restate (at 181) the proposition that a city charter is the "organic law" of the city. To me, this begs the question.

Without relating in detail the legislative history of the Home Rule amendments, particular attention is also called to the following additional facts:

(a) The statement in the original proposal by the legislature for a Home Rule amendment (SJR 3) that the charter of a city "shall become the organic law thereof," so heavily relied upon by the majority (at 181), as well as provisions that the legislature shall provide by general laws for the incorporation of cities, were all deleted in Art XI, § 2, as finally drafted by the sponsors of the initiative measure and as adopted by the voters.

(b) The fact that Art IV, § 1(5), was added, so as to provide specifically that voters of cities shall have initiative and referendum powers as to "*all local* * * * *and municipal legislation of every character* * * *."

(c) The statement in the pamphlet supporting the adoption, by initiative, of the Home Rule amendments in 1906 that their adoption would "give complete home rule" to the voters of cities as to "all purely local business."

(d) The fact that this court in *Hall v. Dunn,* 52 Or 475, 486, 97 P 811 (1908), recognized that intervention by the legislature in the controversy over "local option," clearly a "substantive" matter, "also induced

[ 196 ]

the granting of (Home Rule) power to the legal voters of every city."

(e) The fact that in 1908 in a Voter's Pamphlet argument in opposition to another constitutional amendment (which was not adopted) it was stated that:

> "The foregoing proposed amendment is entirely superfluous, inasmuch as all cities and towns in the State of Oregon do now enjoy the fullest possible home-rule, having absolute self-government—the right to make and amend their own charters and enact their own laws, SUBJECT ONLY TO THE CONSTITUTION AND THE GENERAL CRIMINAL LAWS OF THE STATE. * * *"[5] (Emphasis in original)

(f) The fact that Art XI, § 2, was further amended in 1910 to confer upon cities power to control the sale of liquor, subject to provisions of the "local option" law, after a campaign in which Voter's Pamphlet arguments in favor of the amendment argued that it was "necessary to round out" the Home Rule powers of cities and that cities already had "absolute self-government on all other questions, subject to the criminal laws of the state." In adopting that amendment the people rejected Voter's Pamphlet arguments that "our cities must not be permitted to set up separate principalities in absolute independence of our state laws * * *." As contended by the cities, the adoption by the voters of that amendment "strongly suggests" that when the voters "took what was recognized as a criminal law matter" (and one involving substantive policy) and "put it over on the city side," they thought that the cities already had "exclusive control over certain civil (and substantive) matters

---

[5] As noted by the majority opinion (at 181), contentions made with reference to subsequently proposed constitutional amendments may not be direct evidence of the previous intent of the voters in 1906 in adopting the Home Rule amendments. Nevertheless, these "historical facts" are at least evidence of the common understanding in 1908 and 1910 as to the effect of the then recently adopted amendments.

. [ 197 ]

and were granting cities exclusive control over one criminal (and substantive) matter."[6]

Based upon these "historical facts," all parties agreed on oral argument, that neither W.S. U'Ren nor any of the advocates or opponents of the Home Rule amendments ever "dreamed," much less "intended" (to paraphrase *Rose* and the original majority opinion), that 70 years later a majority of this court would hold that the Home Rule amendments would be applied differently as to matters involving "structure and procedures" of city government and matters of "substantive policy" and that despite the change in language from "general" to "criminal" laws the legislature can nevertheless, by "general law," supersede not only city charter or ordinance provisions relating to matters of "substantive policy," *but also city charter provisions conferring power upon cities to control the compensation paid to all city employees.*

This same conclusion is also supported by the numerous decisions by this court both before and after *Rose*, as cited by the State of Oregon in its brief. These decisions recognized that under the Home Rule amendments cities were granted autonomy as to all "local" or "municipal" matters, as stated in Art IV, § 1(5), in accord with the professed intentions of the proponents of those amendments.[7]

---

[6]*See* n.5, p 197.

[7]The state's brief recognized that in an early line of cases this court also held that with regard to "matters purely local" or "municipal," the cities are autonomous, citing not only *Branch v. Albee,* 71 Or 188, 198, 202, 142 P 598 (1914), but also *Kalich v. Knapp,* 73 Or 558, 566, 142 P 594 (1914); *Thurber v. McMinnville,* 63 Or 410, 415, 128 P 43 (1912); and *Pearce v. Roseburg,* 77 Or 195, 208, 150 P 855 (1915), an opinion by McBride, J.

The state, in its review of the previous decisions by this court, also recognized that:

"* * * The rule that the state cannot effectively legislate as to matters purely municipal somehow survived the *Rose* formulation."

citing *In re Application of Boalt,* 123 Or 1, 17, 260 P 1004 (1927), and *City of Portland v. Welch,* 154 Or 286, 296, 59 P2d 228 (1936), which expressly stated that this principle "has never been repudiated by this court." Both of

It is no answer to these contentions to say, as stated by the majority (at 183) that the cities may still "pursue specified social objectives and social policies." Under the proposed opinion any such "pursuit" might well be illusory because the legislature could at any time choose to pre-empt the subject, even if it involved a matter of "purely local" concern. Of more importance, however, *this case does not involve the "pursuit" by a city of a "social policy," but the question whether the essential power conferred by a city charter upon its governing body to determine the compensation to be paid to its employees may be superseded by a general state statute.*

V. *Problems arising from the "procedure-substance" distinction.*

The second question upon which arguments of counsel were requested on rehearing was "what, if any, other reasons there may be in support of or opposition to" the distinction in the original majority opinion between matters of "structure or procedure" and matters of "substantive policy," including "what, if any, problems may result from the application of that distinction in future cases."

Neither counsel for the State of Oregon nor counsel for the unions made any attempt to support the "procedure-substance" distinction. As previously stated, both rejected and disowned that distinction.

Counsel for the cities, on the other hand, characterized the "procedure-substance" distinction as a rule which will involve the courts of Oregon in a "tussel with a tar baby" and suggested examples of problems that will arise in future cases from the adoption of such a rule, including the following:

these cases were decided long before *State ex rel Heinig v. City of Milwaukie,* 231 Or 473, 373 P2d 630 (1967), which stated the "predominant interest" test.

(a) In the important area of *land use planning,* serious problems could arise in the application of state statutes in a metropolitan area involving two cities, such as Eugene and Springfield, both of which have charter or ordinance provisions on that subject. Such local charter or ordinance provisions may well include *procedures* for land use planning. Under the "procedure-substance" distinction such charter or ordinance provisions, because they involve "procedures," could not be superseded by state law unless held to come within the exception as stated by the previous majority opinion under which such provisions may be superseded by state statute if such a statute is "justified by a *need* to safeguard the interests of persons or entities." The application of such a test, however, would require the court to make a pure "policy" determination and one which would be made without the benefit of any "identifiable criteria" in "precise" words of the constitution.[8] That determination would also be much more difficult by the requirement of a finding of "need," i.e., "necessity." How much more realistic it would be to simply "cut through" this "two-layer cake" of "procedure" and "substance" and determine whether the state's interest in land use planning "predominates" over local choice of procedure for land use planning, as under the test previously adopted by a unanimous court in *Heinig.*

(b) *The open meeting law* is also an example of a statute which arguably, if not probably, involves a matter of "procedure," at least if and when applied to overrule the provisions of a city charter or ordinance which permit "nonopen" meetings, such as "executive sessions" of a city council. Under the proposed opinion state law would not prevail unless "justified by a need to safeguard the interests of persons or entities"—a pure policy determination. Under the *Heinig* test, however, it would be much more simple to hold that

---

[7] As previously noted, the attorney representing the State of Oregon conceded on oral argument that the application by this court of that exception would require this court to make "political" decisions.

the state has a "predominant interest" in openness in government at all levels, including cities.

(c) *The Austrialian ballot* is another example of a possible conflict between state laws and provisions of city charters or ordinances on a "procedural" matter as to which, under the proposed opinion, state law could only be held controlling upon a finding of a "need to safeguard the interests of persons or entities"—a test which is obviously not based upon any "identifiable criteria" to be found in the words of Art XI, § 2, or Art IV, § 1(5).

In addition, the entire "procedure-substance" dichotomy requires an exercise in semantics that will lead to more problems and litigation than it will solve and prevent. For many years the courts have been criticized by legal scholars for their tendency to decide cases by the adoption and application of "categories" which may become little more than "labels," i.e., for the application as an exercise in "mechanical jurisprudence.[9] One of the principal objects of attack by these legal writers has been the distinction between matters of "substance" and "procedure."[10] As pointed out by them, these terms are by no means "infallible categories" and the meaning to be given to them, as well as the distinction between them, often defies logical or objective explanation.[11] As also stated by the Supreme Court of the United States in Hanna v. Plumer, 380 US 460, 471 (1964), "The line between 'substance' and 'procedure' shifts as the legal context changes."

Indeed, this court has rejected the distinction between "procedure" and "substance" as a test for application in determining whether a state statute is to be applied retroactively. Thus it was held in *Joseph v. Lowery,* 261 Or 545, 549, 495 P2d 273 (1972), that

---

[9] *See* Pound, *Mechanical Jurisprudence,* 8 Col L Rev 604 (1908).

[10] *See* Cook, "*Substance and Procedure in the Conflict of Laws,* 42 Yale LJ 333 (1932).

[11] *See* Cook, *supra,* n.10.

"* * * The labels ["procedural" and "substantive"] were applied [in past decisions by this court] after the court decided whether it thought a new statute affected legal rights and obligations arising out of past actions.[12]

Finally, under the heading of "problems" created by the majority opinion, as well as by the previous majority opinion, it is important to again bear in mind the financial impact upon the cities of a rule of "legislative supremacy" in all matters "addressed primarily to substantive social, economic, or other regulatory objectives of the state." As stated in my original dissent (281 Or at 192):

> "The most pernicious feature of the doctrine of state supremacy over cities is the tendency of the legislature to lay burdens on the cities. * * *"

Indeed, according to the cities, the financial burden imposed by these statutes may well cause some small cities "to choose between a volunteer fire department or a paid one."[13]

Under the *Heinig* test this court could properly consider the financial impact of state statutes upon a city as at least one factor in deciding whether the interest of the city "predominates" over that of the state. Under the majority's rule of "legislative supremacy," however, no consideration may be given to that fact. Instead the questions to be decided by this court would be whether the statute is "addressed primarily to substantive social, economic, or other regulatory objectives of the state" or, if the statute involves a matter of the "structure or procedures," of local government, whether there is a "need to safeguard the interests of persons or entities."

---

[12]It may be, as stated by the majority (at 184), that its distinction between matters of "procedures" and "substance" for the purposes of this case is in a different "legal area," as compared to "such legal areas as conflicts of law or retroactivity." Nevertheless, similar problems of "categories" arise from the use of such terms in all "legal areas."

[13]The financial impact upon cities of the new rule of "legislative supremacy," as adopted by the majority, is discussed in more detail in my previous dissenting opinion. (*See* 271 Or at 191-198.)

With all due respect, it is submitted that to adopt such rules as the basis for decision of Home Rule cases is to adopt rules stated in "rubbery adjectival language" that will only cause more problems than they will solve.

## VI. *The futile search for "identifiable criteria derived from constitutional command."*

The primary criticism of the "predominant interest" test of *Heinig* by the previous majority opinion was that it required this court to decide cases based upon "the court's own political judgment" (281 Or at 154), whereas in such cases "the court's decision must be derived from a constitutional standard * * *." (281 Or at 147) The majority purports (at 178) to find in the word "charter" in Art XI, § 2, a basis to support its distinction between matters of "procedure" and "substance" as a distinction based upon what are described (at 185) as "identifiabale criteria, derived from constitutional command to the legislature to let local voters choose their own modes of government."

For the reasons previously stated, it is submitted, with all due respect, that the word "charter" in Art XI, § 2, provides no such "identifiable criteria"; that the "procedure-substance" dichotomy, which provides the basis for the proposed opinion, is "invisible" in the terms of the Home Rule amendments and that the application of that dichotomy, together with the exceptions which must also be applied under it, would continue to involve this court in the making of "policy" determinations, without the benefit of "identifiable criteria" based upon any "constitutional command." Thus, in my view, the quest by the majority for a solution under which this court can decide "Home Rule" cases by the application of "identifiable criteria derived from constitutional command" has been vain and illusory.

I would be the first to agree that, whenever reasonably possible, this court should not decide cases by the exercise of its "political judgment" and that if such

[ 203 ]

"identifiable criteria" can be properly found in the words of the Home Rule amendments, they should be controlling in cases such as this. Unfortunately, it is one of the "facts of life" that constitutions do not always provide such "identifiable criteria."

A close analogy arises in cases involving the question of "separation of powers." The constitution provides no "identifiable criteria" to be applied in cases such as the recent one in which the legislature sought to require that appointments by the governor be made subject to its approval.[14] Instead, as the Oregon Constitution is written, the people of Oregon have imposed upon this court the duty to act as a "constitutional referee" between the executive and legislative branches of government in cases involving matters over which each claims exclusive power.

Similarly, the people of Oregon, in whom all sovereignty resides, can "parcel out" that sovereignty as they choose between the state and the cities. By adoption of the Home Rule amendments they have made a grant of power to the cities, including a grant of power to enact and amend charters including, by implication, ordinances pursuant to such charters (as the majority opinion would agree), and a grant to the voters of cities to do so by the exercise of initiative and referendum powers "as to all local * * * and municipal legislation of every character."

It follows, in my judgment, that even though no more "identifiable criteria" can be found in these terms than the words "local" and "municipal" legislation, the people of Oregon have imposed the duty upon this court to act as a "constitutional referee" to decide, by the application of these words, all disputes in cases in which the state legislature and city claim exclusive power of legislation, just as this court must decide disputes between the legislature and the governor over claims of exclusive power, and without the guidance of any more "identifiable criteria."

---

[14] *See State ex rel Boe v. Straub,* 282 Or 387, 578 P2d 1247 (1978).

Under the "predominant interest" test of *Heinig,* such cases would be decided by a "balancing" of the interests of the city against those of the state. There was nothing novel in the adoption of that approach. Indeed, the "balancing" test has been adopted by the courts in many types of cases in which there are no "identifiable criteria" based upon "words" in a constitution and such a test is no more improper than the test of "fairness," as adopted by courts for application in other cases involving an absence of such "identifiable criteria." (*See* original dissent, 281 Or at 179.) Indeed, the majority states (at 182) that it "reaffirms" the *Heinig* test for application in cases involving matters of "structure and procedures" of local government.

Finally, the majority (at 186) is critical of the petition for rehearing in that it "debates only the general tenor of the opinion in this case," rather than "the question actually at issue, the validity of the retirement and insurance" statutes. The concern of the cities, however, as expressed both in their petition for rehearing and on oral argument, goes to more than "the general tenor" of the previous majority opinion. It goes to the adoption of a rule of "legislative supremacy," based upon the distinction between matters of "substance" and "procedures," because of the many problems that would result for cities by the adoption of such a rule, for reasons previously stated, and because such a rule would strip cities of much of their present "local autonomy."

Indeed, as previously stated, counsel for the cities conceded that the result in this case might be the same under the "predominant interest" test of *Heinig.* Upon the application of that test, however, the rationale would be that the interest of the state in police and fire protection is so great as to "predominate." Such a decision would have support in respectable authority, as pointed out in my original dissent (281 Or at 189). Such a decision would not, however, as does the majority opinion in this case, provide a basis under

which the legislature may, if it so chooses, enact a statute requiring cities to provide insurance policies and pension benefits to *all* city employees, and in amounts as provided by such a state statute.

There may be no magic in the words "predominant interest." Some other descriptive words might be more appropriate in deciding disputes as to what are proper matters of "local * * * and municipal legislation." In my opinion, however, the "predominant interest" test, as stated in a scholarly opinion by Justice O'Connell and as adopted by a unanimous court in *Heinig*, provides the best and most practical solution to this difficult problem. This court has found it possible, without problems as evidenced by any dissenting opinion, to apply that rule in a number of subsequent cases, as noted in my original dissent (281 Or at 164-165), which also discussed the rationale of that rule and pointed out (at 177-178 and 159-160) that the decision of this court in *Heinig* has been recognized by legal writers as a sound judicial decision and one consistent not only with decisions by the courts of other states, but with the recognized purpose of state Home Rule amendments as a "distribution of power by the people between two levels of government—state and local."

In contrast, the rule as adopted by the majority, based upon a distinction between matters of "procedure" and "substance," has been disclaimed by all of the parties to this case, including the attorney for the cities of Oregon, the attorney representing the employees of the cities and the attorney representing the State of Oregon. It is a rule without precedent and a rule that will create more problems than it will solve.

As noted in my previous dissenting opinion, most modern students in municipal affairs have urged the desirability of constitutional grants to cities of broad "home rule" powers.[15] In some states, however, the

---

[15] *See* 281 Or at 160, 576 P2d 1204, 1217 (1978), and authorities cited therein.

attainment of that objective has been impeded by narrow and restrictive judicial interpretations of such constitutional provisions.[16] For the past 40 years "home rule" in Oregon has not been subjected to this problem in view of unanimous decisions by this court which have liberally construed the Home Rule Amendments to the Oregon Constitution. It is thus particularly discouraging that the majority of this court has chosen to deliberately overrule that long line of unanimous decisions and to join those courts which have adopted a narrow and restrictive interpretation of Home Rule powers.

It may be that history alone will judge the wisdom of that decision, unless the voters of Oregon do as the voters of some other states have done in response to such decisions, and adopt a new Home Rule amendment with an even clearer grant of exclusive Home Rule powers as to all matters of local and municipal concern [17]

For all of these reasons I dissent.

Howell, J., joins in this dissent.

**BRYSON, J.,** dissenting.

I join in the dissent of Justice Tongue. I further dissent for the reasons stated in my original dissenting opinion, 281 Or at 194, 576 P2d 1234 (1978). I wish to emphasize my constitutional objection. The Oregon Constitution, Art XI, sec 11, provides in part:

---

[16] *See* Vanlandingham, *Constitutional Municipal Home Rule Since the AMA (NLC) Model,* 17 Wm and Mary L Rev 1, 30 (1975).

*See also,* Mott, Strengthening Home Rule, 39 Nat'l Municipal Review 172 (1950); Richland, Courts Nullify Home Rule, 44 Nat'l Municipal Review 565 (1955); Sharp, *Home Rule in Alaska: A Clash Between the Constitution and the Court,* 3 UCLA-Alaska L Rev 1, 51 (1973); and Vanlandingham, *Municipal Home Rule in the United States,* 10 Wm and Mary L Rev 269, 281, 293 (1968).

[17] *See* Mott, *supra* n. 16, in which it is noted (at 173) that:

"The people of California found it necessary to amend the state constitution eight times before they convinced the courts that they meant what they said when they gave the cities authority with 'respect to municipal affairs.' * * *."

"Section 11. Tax limitation. (1) Except as provided in subsection (3) of this section, no taxing unit, whether it be the state, any county, municipality, district or other body to which the power to levy a tax has been delegated, shall in any year so exercise that power to raise a greater amount of revenue than its tax base as defined in subsection (2) of this section. The portion of any tax levied in excess of any limitation imposed by this section shall be void.

"(2) The tax base of each taxing unit in a given year shall be one of the following:

"(a) The amount obtained by adding six percent to the total amount of tax lawfully levied by the taxing unit, exclusive of amounts described in paragraphs (a) and (b) of subsection (3) of this section, in any one of the last three years in which such a tax was levied by the unit; or

"(b) An amount approved as a new tax base by a majority of the legal voters of the taxing unit voting on the question submitted to them in a form specifying in dollars and cents the amount of the tax base in effect and the amount of the tax base submitted for approval. The new tax base, if approved, shall first apply to the levy for the fiscal year next following its approval.

"(3) The limitation provided in subsection (1) of this section shall not apply to:

"(a) That portion of any tax levied which is for the payment of bonded indebtedness or interest thereon.

"(b) That portion of any tax levied which is specifically voted outside the limitation imposed by subsection (1) of this section by a majority of the legal voters of the taxing unit voting on the question.

"* * * * *."

Subsection (2) means that if the state wanted to levy a tax on real property to fund state programs, it would have to return to the year in which it last levied a property tax and could collect only that amount plus six percent. Alternatively, it could ask the voters to approve a new tax base for the state. The first method would presumably produce minimal funds because it has been years since the state levied a tax on real

property,[1] and the second method would probably not be happily received by the voters. It follows, then, that the state could not directly raise money by a state real property tax levy to pay the insurance company premiums per its contract. ORS 243.015.

But the legislature conceived an ingenious way around the constitutional limitation. They decided to specifically mandate this pension and insurance program and have the local governments pay the state for the sums they have expended plus the administrative expenses incurred by the Department of General Services. Accordingly, they adopted the following statutes:

ORS 243.015:

"* * * [T]he Department of General Services shall enter into a contract with an insurance company licensed to do business in this state to purchase insurance as described in ORS 243.025 for all police officers and firemen in the service of public employers."

ORS 243.035:

"(1) The premiums and administrative costs incurred by the Department of General Services for the insurance provided for in ORS 243.005 to 243.045 shall be paid by the affected public employers and shall not come from funds of the Public Employes' Retirement System.

"(2) *Every public employer shall include in its budget amounts sufficient to pay the annual premiums accruing on the policies of insurance issued pursuant to ORS 243.005 to 243.045, and amounts sufficient to reimburse the Department of General Services for its administrative expenses incurred under ORS 243.005 to 243.045."* (Emphasis added.)

Certainly, the state legislature has previously created local programs which, if carried out by the local governmental subdivision, would result in additional costs and an increase in the tax levy to pay therefor. An example of this would be the creating of a new circuit court position with its attendant expenses

---

[1] For all practical purposes, the state has no tax base for a state levy on real property.

of courtroom space and services. However, under such circumstances the county commissioners budget for the expenses and they do not remit to the state Department of General Services. The legislature has never, from my limited examination of statutes, told a city or county to put the cost of a state-mandated program in the city or county budget, which then finds its way on the tax roll as an assessment on real property within the county or local governmental subdivision for the purpose of reimbursing the state. Regardless of any previous abuse, it does not make the present devious approach for the raising of money any less objectionable pursuant to the above constitutional provision.

At the time Article XI, section 11, of the Oregon Constitution was adopted, and at the time the legislation in question was passed, local governments funded and still principally fund, their operations through real property taxes. At a time when even the local real property tax is under attack by the citizenry for other reasons, it is unrealistic to argue that local governments could, or legally should, assess and levy on real property for additional taxes to pay the State Department of General Services for the state-mandated program.

In a great many instances, and particularly in cities the size of Astoria and La Grande, the expenses of these legislative mandates will be funded by a local tax on real property. The state is, therefore, in effect levying real property taxes for its own purposes through the local governments. In allowing the present legislation to stand, the majority is allowing the state to levy real property taxes without a vote of the taxpayers, and this the state is constitutionally forbidden to do.

For the above reasons, I dissent from the majority opinion and would affirm the circuit court judges and the Court of Appeals, which held the aforementioned legislative programs unconstitutional.