Argued April 17, affirmed July 30, reconsideration denied
September 6, petition for review allowed October 16, 1979

REILLEY, et al,
*Appellants,*
*v.*
## SECRETARY OF STATE, et al,
*Respondents,*
*v.*
## CLACKAMAS COUNTY COMMISSIONERS, et al,
*Intervenors-Appellants.*

(No. 107-021, CA 12311)

598 P2d 323

Earl H. Mickelsen, Portland, argued the cause and filed the briefs for appellants.

Janice M. Stewart, Portland, argued the cause for respondents Metropolitan Service District, Charles Kemper, Columbia Region Association of Governments and Denton Kent. With her on the brief were E. Andrew Jordan, Portland, and Hardy, McEwen, Newman, Faust & Hanna, Portland.

Scott H. Parker, Oregon City, argued the cause for intervenors-appellants. With him on the briefs were Michael E. Judd, Oregon City.

Al J. Laue, Assistant Attorney General, Salem, waived appearance for respondent Secretary of State.

Before Schwab, Chief Judge, and Thornton and Joseph, Judges.

JOSEPH, J.

**JOSEPH, J.**

This is an action brought to have Oregon Laws 1977, chapter 665, declared to be unconstitutional or to be void because it violates provisions of other statutes. The plaintiffs are identified only as "registered voters and citizens of Clackamas County."[1] Although the complaint stated that it was brought as a class action, nothing was done to comply with ORS 13.230. The Secretary of State was eventually dismissed as a party on plaintiffs' motion.[2] The defendants Kent and Kemper were respectively the executive directors of the Columbia Region Association of Governments ("CRAG") and the Metropolitan Service District ("MSD") prior to the effective date of the Act. The intervenors-appellants county commissioners and county treasurer were originally defendants, but they were dismissed as defendants and allowed to intervene on the side of plaintiffs by stipulation.[3]

MSD and Kemper moved for summary judgments; intervenors and plaintiffs filed separate cross-motions for summary judgment; then CRAG and Kent moved for summary judgment. In a brief letter opinion summary judgment was allowed to MSD and Kemper, and an order was subsequently entered dismissing the action as to all defendants. Plaintiffs and intervenors appeal.

Some background is in order. Prior to the effective date of chapter 665, CRAG was a regional planning district under ORS 197.705-.795 operating in the "metropolitan area" defined as the "area which is within the boundaries of Clackamas, Multnomah and Washington Counties." ORS 197.710(6). It was not

---

[1] Their standing has not been challenged.

[2] Although the action directly and indirectly challenged the Secretary of State's responsibility as the state's chief election officer, no objection was made to the dismissal and no question is raised on appeal as to whether she is a necessary party.

[3] The standing of the treasurer as a party to the complaint in intervention was never challenged.

subject to ORS chapter 198, which deals with service districts generally. It was organized to be the successor to a previously existing planning agency which had a different geographical area and more limited powers. It was a membership organization composed of the counties and the cities in those counties and governed by a board of directors made up of a representative from each county, one from the City of Portland and one from the cities collectively. There were statutory provisions for "associate members." Although designated a "municipal corporation," it had no power to levy taxes.

The functions of CRAG encompassed regional land use planning, including the adoption of goals and objectives, preparation of a regional plan, designation of areas and activities having significant impact on the orderly and responsible development of the region, review of the comprehensive land use plans of its members and associate members, coordination of land use planning activities, the review of zoning, subdivision and other land use controls of its members and the coordination of its activities and the activities of its members with similar activities of the federal government, other local government bodies and agencies of state government. ORS 197.755-.765. Apart from grants and other funds received under authority of ORS 197.795, its activities were financed entirely from annual assessments on members on a per capita population basis. ORS 197.785(3).

MSD was organized in 1970 under Oregon Laws 1969, chapter 700, which permitted the creation of such a municipal corporation in a "metropolitan area," defined as "the Oregon portion of a standard metropolitan statistical area designated by an agency of the United States."[4] The permissible operations of a Metropolitan Service District were gradually expanded by the legislature, so that after the enactment

[4] In 1970 there were three standard metropolitan statistical areas in Oregon: Multnomah, Clackamas and Washington counties (plus Clark County, Washington), Marion-Polk counties; and Lane County.

of Oregon Laws 1977, chapter 782, section 3, ORS 268.030 provided:

> "(1) This chapter is enacted in order to provide a method of making available in metropolitan areas public services not adequately available through previously authorized governmental agencies.
>
> "(2) To this end not more than one district may be established under this chapter in any metropolitan area.
>
> "(3) Subject to the limitations of state law, the district may provide:
>
> "(a) Metropolitan aspects of sewerage, solid and liquid waste disposal, control of surface water, cultural facilities and public transportation; and
>
> "(b) Metropolitan zoo facilities; and
>
> "(c) Local aspects of those public services authorized by paragraphs (a) and (b) of this subsection that are transferred to the district by agreement between the district and other public corporations, cities or counties."[5]

With voter approval a district was authorized to assume additional functions.

MSD was the only Metropolitan Service District ever organized under the 1969 Act. It was governed by a body having a representative from each county, one from Portland and one chosen jointly by the mayors of the cities in the district in each of the counties. With respect to each of its permitted functions, it was given broad general powers of acquisition, construction, maintenance and operation. It had the power to seek a tax base, to levy a general ad valorem property tax (and with voter approval a special levy for the Metropolitan Zoo), to levy special assessments and to impose service and user charges. Also it had general obligation and revenue bonding authority. It was authorized to exercise police powers and to enact ordinances to carry out its functions. It was also a special service district under ORS chapter 198. ORS 198.010(6).

------

[5] The 1977 amendment had added "cultural facilities" to subsection (3)(a).

The 1977 legislature enacted the challenged Act, section 1 of which contained this statement:

"The Legislative Assembly hereby finds that there exists a proliferation of regional governments in the Portland metropolitan area, leading to duplication of public services, overlapping jurisdictions and a confusion and unfamiliarity by citizens as to the governmental decisions affecting their lives and property; and hereby declares that the purpose of this Act is to provide for the consolidation of those regional governments and to establish an elected governing body and thereby to increase the accountability and responsiveness of regional government officials to the citizenry through the election process."

To accomplish the stated purposes, the Act did these things:

1. It amended ORS 268.020 to change the definition of "metropolitan area" from a standard metropolitan statistical area to "that area which lies within the boundaries of Clackamas, Multnomah and Washington counties."

2. It expanded the authority of MSD to encompass:

"(3)(a) Metropolitan aspects of sewerage solid and liquid waste disposal, control of surface water, public transportation, water supply, human services, parks and recreation, cultural facilities, libraries, correctional facilities and correctional programs; and

"(b) Metropolitan zoo facilities; and

"(c) Local aspects of those public services authorized by paragraph (a) and (b) of this subsection that are transferred to the district by agreement between the district and other public corporations, cities or counties; and

"(d) By contract, metropolitan and local aspects of services authorized under this chapter to areas outside the district boundaries."

"(4) A district, where formed shall provide for those aspects of land use planning having metropolitan significance." Or Laws 1977, ch 665, § 3; ORS 268.020(3), (4).

[298]

3. It abolished the former governing body and replaced it with a 12-member non-partisan, representative council elected from single-member subdistricts and provided for an executive officer elected on a non-partisan basis at large from the whole district.

4. It gave the district substantially the same authority as formerly provided by ORS 268.310(1)-(5) and, subject to the precondition of voter approval of a tax base or an income tax, new authority over water supply and distribution, human services, parks and recreational facilities, facilities for cultural, convention, exhibition, sports and entertainment purposes, juvenile and adult corrections and libraries. Or Laws 1977, ch 665, §§ 10, 10a.

5. It provided for taking over the functions of the local boundary commission with voter approval.

6. The district was given the power to enact ordinances, subject to ORS chapter 198, and was made an agency within the meaning of the Administrative Procedures Act, ORS chapter 183.

7. The area encompassed by the district was delineated in such a way as to include some areas formerly not included and to exclude some areas formerly included in MSD.[6]

8. With respect to land-use planning, the duties and powers provided for CRAG as a regional planning district under ORS 197.190 and 197.755(1),(4),(5) and (7) were assigned to MSD (Or Laws 1977, ch 665, § 17) and additional powers to deal with air and water quality and transportation were created. Or Laws 1977, ch 665, § 18.

---

[6] As organized in 1970, MSD did not encompass all of the area in the standard metropolitan statistical area, despite the definition of "metropolitan area" in ORS 268.020(2). The 1969 Act provided for a process to delineate the area actually to be included. Or Laws 1969, ch 700, § 5. Unfortunately nothing in the record of this case helps clarify precisely the differences between the old and new boundaries or to establish whether plaintiffs lived within either.

9. To finance the functions permitted by sections 17 and 18 of the Act, MSD was given the same power until June 30, 1981 to assess cities and counties as CRAG had had under ORS 197.785(3).

10. MSD was given the same powers as a county to create special service districts under ORS chapter 451 for purposes within its authority.

11. The district was authorized to impose income taxes on persons and entities, with voter approval.

12. ORS 197.705-.795 were repealed on the "operative date" of the Act, thereby abolishing CRAG, but that organization's rules, as well as pending legal proceedings and obligations owed by or to it, were preserved. Or Laws 1977, ch 665, §§ 24, 25, 26 and 27.

13. The district's authority to take over a mass transit district, impose an ad valorem property tax and issue general obligation and revenue bonds given by ORS 268.370-.660 was unchanged.[7]

Section 31 of the Act provides:

"This´ Act shall be referred to the people of Multnomah, Washington and Clackamas Counties for their approval or rejection at a state-wide special election held on the date of the next primary election."

At the May, 1978, primary election the Act was put to a vote as Ballot Measure 6. A majority of all voters in the tri-county area approved it, but the voters in Clackamas County voted no. The Act was declared to have been approved, and it took effect by its terms. This action was filed on June 28, 1978.

Plaintiffs have attacked the validity of the law from as many sides as they could think of. After extensive analysis, most of the challenges have turned out to warrant no more than passing notice. Only a few

---

[7] *But see* Or Laws 1977, ch 95.

present substantial issues. We take up both categories roughly in the order presented.[8]

Article XI, section 2 of the Oregon Constitution provides:

> "Corporations may be formed under general laws, but shall not be created by the Legislative Assembly by special laws. The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, and the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors therein is vested in such municipality; but such municipality shall within its limits be subject to the provisions of the local option law of the State of Oregon.

Plaintiffs assert that the 1977 Act was a "special law" within the meaning of this provision and was beyond the power of the legislature.[9] As best we understand the argument, it runs: (1) The legislature is limited, at least insofar as municipal corporations are concerned, to enacting enabling laws of general, state-wide coverage; (2) the scope of the subject act is limited to Multnomah, Washington and Clackamas counties by its terms and is *ipso facto* a "special" or "local" law; and (3) therefore, it is void. In (2) there is perhaps a subsidiary proposition to the effect that the legislature "created" MSD by the passage of the act, which is forbidden to be done by the constitutional provision quoted.

Defendants go to issue point by point with the syllogism. First, they deny that chapter 665 is a special law, either because the distinction between

---

[8] Plaintiffs' task was made difficult by the incompatibility of their two objectives: They want to uphold the abolition of CRAG and to strike down the approval of the reorganization of MSD.

[9] Intervenors make the same assertion, and what we say on this point is determinative of their contention, too.

general and special laws is of little meaning when the concern is with regions of the state having specific problems of state-wide importance, or because the act did not "enact, amend, or repeal any charter or act of incorporation for any municipality" but merely amended the law under which MSD already existed to cause a reorganization, or because the voters approve the changes. If this case required us to decide whether the act is special or local on the one hand or general, we would have to say that it is special or local on the basis of the analysis of the prohibition of local or special laws in Article IV, section 23 in *Evert v. Oregon & Western Colonization Co.*, 123 Or 225, 228, 261 P 443 (1927), which was reaffirmed in the last case to deal generally with the question, *State ex rel v. Malheur County Court*, 185 Or 392, 414, 203 P2d 305, 315 (1949):

> "A local law is one operating upon persons or property within a limited boundary or specified locality. It is not the extent of the territory over which it operates that alone determines whether the law is general or local, or the number of persons who are to be governed by it. 'To be local legislation, it must apply to and operate exclusively upon a portion of the territory of the state and the people living therein,' and upon no other persons or property, 'for if it applies to and operates on persons or property beyond such locality, it is not local.' 'A special statute is one that is only applicable to particular individuals or things.' 'They are those made,' says Mr. Sutherland, 'for individual cases, or for less than a class, requiring laws appropriate to its peculiar condition and circumstances; local laws are special as to place.'*** A public or a general law is one which affects the public either generally or in some classes."

However, it does not appear that resolution of the issue is necessary. If the act was general, it was within the legislature's power to enact it; but if it was a special law, it was unlawful *unless and until* it had been approved pursuant to the provisions of Article I, section 21, of the Oregon Constitution:

[302]

"No ex-post facto law, or law impairing the obligation of contract shall ever be passed, nor shall any law be passed, the taking effect of which shall be made to depend upon any authority, except as provided in this Constitution; provided, that laws locating the Capitol of the State, locating County Seats, and submitting town, and corporate acts, *and other local, and Special laws may take effect, or not, upon a vote of the electors interested.*—"(Emphasis supplied.)

■ Because the Act provided for a reference "to the people of Multnomah, Washington and Clackamas Counties for their approval or rejection" and it was approved by them, the only issue which actually might have been presented is whether all of the voters of the three counties were "the electors interested." Aside from a quotation from and reference to Article I, section 21, and the arcane comment "Clackamas County showed its disinterest" made in connection with the next issue to be discussed, plaintiffs offer nothing on this point; intervenors hardly mention it at all; and defendants (in dealing with another argument) merely refer to the provision and say:

"However, that provision is stated as an exception to the general rule and only states that local laws *may* be submitted to a vote of the electors, not *must* be submitted."

In other words, there never has been a serious, solid and developed contention that the voters to whom the act was referred were not the appropriate ones. We conclude that if chapter 665 was a special law, it was approved by the interested electors as required by the Constitution.

The next claim by plaintiffs is:

"The thrust of the Oregon Constitution requires an affirmative vote before the Act can be made applicable to a stated entity, in this case, Clackamas County."

[303]

They cite Article XVIII, section 10,[10] Article I, section 21 and ORS 203.010[11] and proceed to argue that the act is void because "promiscuous tinkering by the legislature with existing county functions can open Pandora's Box." The best that can be made of that assertion is to read it to say that by permitting the act to become effective on the basis of a majority of the votes cast in the three counties combined, the legislature took something away from Clackamas County that it previously had under the Constitution or ORS 203.010.[12] Suffice it to say that the incomprehensibility of the proposition is its own answer, for we can see no way in which anything more is involved than the power of the legislature to allocate and delegate authority to deal with matters of legitimate legislative concern. *See La Grande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204; 284 Or 173, 586 P2d 765 (1978).

The next "issue" is stated thusly by plaintiffs:
"The thrust of the Act and Oregon statutes mandate that an entity voting against this Act is exempt from the provisions thereof."

---

[10]

"All property and rights of the Territory, and of the several counties, subdivisions, and political bodies corporate, of, or in the Territory, including fines, penalties, forfeitures, debts and claims, of whatsoever nature, and recognizances, obligations, and undertakings to, or for the use of the Territory, or any county, political corporation, office, or otherwise, to or for the public, shall inure to the State, or remain to the county, local division, corporation, officer, or public, as if the change of government had not been made. And private rights shall not be affected by such change.—"

[11]

"Each county is a body politic and corporate for the following purposes:

"(1) To sue and be sued;

"(2) To purchase and hold for the use of the county lands lying within its own limits and any personal estate;

"(3) To make all necessary contracts; and

"(4) To do all other necessary acts in relation to the property and concerns of the county."

[12] Intervenors have not associated themselves with this argument.

All that needs to be said in response is that it reveals more than a little confusion about what "entities" are involved here. If that word has any meaning in this context, it must be that the "entities" are MSD (old and new), CRAG and "the people of" the three counties collectively. Clackamas County as a political "entity" was not involved in the decision-making process at all. The related argument that ORS 198.910(1)[13] was violated must be rejected out of hand for these reasons: CRAG was not a district pursuant to ORS chapter 198. The definition of "district" in ORS 198.710 does not include counties. Finally, the election provisions of ORS chapter 198 cannot apply to approval of the CRAG-MSD consolidation because CRAG was not subject to them.

Chapter 665 was submitted to the voters under this ballot title:

"PURPOSE:  Metropolitan Service District reconstituted with subdistrict election of 12 member governing council, elected executive officer, revised boundaries. Abolishes CRAG, transfers regional land use planning functions to district. Authority to assess cities expires 1981. Voters may transfer boundary commission functions to district. If voters approve income tax (1% limit) or tax base, district may assume metropolitan aspects of enumerated (recreational, correctional, library, etc.) services beyond existing functions. Authorizes local service district formation. Effective January 1, 1979."

Plaintiffs make several related contentions. First, they assert that "at least two subject were contained in the Act" in violation of Article IV, section 20 of the

---

[13]
　　"(1) At the elections if a majority of the votes cast in each affected district is in favor of merger or consolidation, the board of the district having the highest assessed valuation for taxation purposes shall call a joint meeting of the boards of the affected districts. The meeting shall be held at a time and place designated by the board calling the meeting, not later than 10 days after the canvass of the vote in the district last canvassed. The secretary of the board calling the meeting shall give notice by certified mail of the time and place of the meeting to each member of the boards of the affected districts."

Oregon Constitution,[14] and that "each involved a separate constituency," *i.e.*, CRAG included all of the voters in three counties, while "old" MSD included less than all of those voters. But plaintiffs do not urge that the act was wholly bad by reason of those claims; instead, they claim that the only part of the act that *was* approved by the proper constituency (in a geographical sense) was the part that abolished CRAG. That effect of the act, then, they would have stand as separable from the rest.

Aside from the illogic in claims that on the one hand the law cannot stand because the voters of Clackamas County voted against it and that on the other hand part of it can stand because the majority of all voters in the three counties approved it, there are several defects in the claim. First, there is no authority that even suggests the prohibition against two subject in the same legislation could possibly be applied in that fashion. *See,* passim., 8 ORS, Annotations, Or Const, Art IV, § 20. Second, the whole act is pregnant with the conclusion that the legislature did not intend the presumption of separability to be applied to a comprehensive scheme of revision and reorganization. Third, the inter-relationship and dependency of the reorganization of MSD, the abolition of CRAG and the transfer of its powers and authorities to MSD are obvious on the face of the statute.

The next level of attack is a confabulation of propositions summarized under the assertion "that the

---

[14]

"Every Act shall embrace but one subject, and matters properly connected therewith, which subject shall be expressed in the title. But if any subject shall be embraced in an Act which shall not be expressed in the title, such Act shall be void only as to so much thereof as shall not be expressed in the title.

"This section shall not be construed to prevent the inclusion in an amendatory Act, under a proper title, of matters otherwise germane to the same general subject, although the title or titles of the original Act or Acts may not have been sufficiently broad to have permitted such matter to have been so included in such original Act or Acts, or any of them."

Act is so ambiguous that it must fall on its face or for constitutional infirmities." The most we can make of the propositions that follow after that is that it is claimed the law provides for a superstructure on county government that constitutes a taking of power and responsibility from the counties and giving them to MSD, which is said to be some sort of usurpation of the "right of citizens of the county to look to their elected Senators and Representatives and to the Board of County Commissioners." All of the asserted propositions are essentially only political in nature and style and have no specific legal foundation. The only specific "ambiguity" asserted is that supposedly it is not clear what powers MSD will exercise with respect to land use control throughout thewholeof the three counties. The only appropriate response is: Look at section 19(1) of the Act!

Under the heading "IMPROPER INVESTITURE" plaintiffs say:

> "The Act proposes to invest in the governing body of the MSD administrative, legislative and judicial powers in contravention of the Constitution of the State of Oregon."

We could not improve on defendants' response:

> "There is no substance whatsoever to this allegation. Section 21 of the Act specifically provides that MSD is to be considered a county and a county court *only* for the purposes of ORS chapter 451 pertaining to the establishment of public service districts. This section only authorizes MSD to establish subsidiary service districts within its boundaries without requiring the separate approval of each county for every such formation or change, as would otherwise be required by ORS 451.435(1). The designation as county court is used only to conform to the terminology of ORS chapter 451 which refers to the governing body of a county, including a board of county commissioners, as a 'county court.' Nothing in the Act can be construed to give the MSD council any of the powers of the judicial branch."

[307]

We are brought to plaintiffs' last proposition: "The Act proposes methods of taxation in contravention of the Constitution of the State of Oregon." Intervenors join in this attack in two specific ways. First, they say that chapter 665 is a special act that gives MSD "authority to levy a personal or business income tax." Second, they say that section 16, which authorizes the imposition of a per capita assessment on cities, counties and other municipal corporations within the district to pay for MSD services, authorizes taxation which is "non-uniform" and "discriminatory."

As with most of the issues in this case, it is difficult to come to grips with these purported defects in the act because plaintiffs in particular, and the intervenors to a lesser extent, seem to be satisfied to make bald assertions without regard to premises or supporting argument.

For example, intervenors summarize their first challenge in this fashion:

"Article IX, section 1, of the Oregon Constitution provides in part that '[a]ll taxes shall be levied and collected under general laws operating uniformly throughout the State.' Ch. 665 gives the new MSD authority to levy a personal or business income tax. Ch. 665 is a special Act rather than a general law. Therefore, this income tax would be levied and collected under a special Act, rather than under a general law, in violation of Article IX, section 1."

At least the following defects in the syllogism are detectable:

1. Chapter 665 does *not* "give" MSD any income tax authority *vel non.* It authorizes the district to pass an ordinance ("consistent with any state law relating to the same subject" (section 22(4)) to impose income taxes, but it would become effective only when approved by the voters. In other words, MSD has the power to seek voter approval of income taxes.

2. Chapter 665, when it was approved by the voters, was no longer a prohibited special act, if it ever was.

[308]

■ 3. There is absolutely no authority that forbids the legislature from passing an enabling act for the imposition of taxes by a municipal corporation. *See Horner's Market v. Tri-County Metropolitan Transportation District*, 2 Or App 288, 467 P2d 671, *rev den* 256 Or 124, 471 P2d 798 (1970).

■ The intervenors' second attack seems to have two parts. The first is that the provision for the payment by counties and cities in the district of fees for its services and activities allocated on a per capita basis involves the imposition of a "tax." The second is that the tax is subject to and violates Article I, section 20, of the Oregon Constitution[15] and Article I, section 32.[16]

We need not reach the second part. The first part is pure *ipse dixit* on the part of intervenors without any reasoning or supporting authority, but plaintiffs urge that the word "assessment" means the levying of a tax. *Ergo*, the service and activity fee is a tax. They proceed to argue that the taxpayers are the citizens of the whole county, whether they live in or out of the district. We cannot accept that characterization. The theory of the act is that MSD will perform services and activities for the entire district and that the district as a whole should pay for them. The mechanism chosen is to require the cities and counties to pay the fee, on an equal per capita basis, from their revenue. It does not appear to us how the per capita fee is any more of a "tax" than would be, say, a flat rate charge imposed by Clackamas County for any service it is authorized to perform. The assessment is simply another obligation mandated on counties by state law, the wisdom of

---

[15]
"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens.—"

[16]
"No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly; and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax. [Constitution of 1859; Amendment proposed by H.J.R. No. 16, 1917,and adopted by people June 4, 1917]"

[309]

which is not our concern. *State ex rel v. Malheur County Court, supra.*

The act authorizes MSD to assess Clackamas County for its share of MSD expenses based on the population of unincorporated areas of the county within MSD in proportion to the total population encompassed by MSD. Plaintiffs confuse the method of allocating the burden among the various entities which exist within MSD and the method of collecting the assessment. Payment is required from Clackamas County revenues, without distinction as to the source of those revenues, and no levy is authorized to be made directly or indirectly on individual residents of the county.[17]

The trial court was correct in allowing MSD's and Kemper's motion for summary judgment, in denying plaintiffs' and intervenors' motions for summary judgment and in dismissing the amended complaint with prejudice.

Affirmed.

---

[17] Plaintiffs and intervenors both rely in part on a contention that the fee will be paid from the revenue produced by *taxes* imposed on all the cities and counties in the district. The act does not designate a revenue source for payment of the assessment. Assuming, as is most likely, that it will be paid from general fund revenue, it does not follow that any *tax* money will necessarily be involved. Municipal and county general fund revenue is derived from many sources, of which taxation is but one. *See* ORS 294.311(26); 294.361; 294.351(2).