Argued and submitted July 10, 2000, reversed and remanded in part; otherwise affirmed March 14, 2001

Francis STADELMAN,
Individually and as Trustee,
*Appellant,*

*v.*

CITY OF BANDON,
a municipal corporation,
Matt Winkel, City Manager,
and the State of Oregon,
by and through the
Department of Environmental Quality,
*Respondents.*

(97 CV 1207; CA A105685)

20 P3d 857

Margaret Leek Leiberan argued the cause for appellant. On the opening brief were Manuel C. Hernandez and Manuel C. Hernandez & Assoc., P.C.

Jeffery J. Matthews argued the cause for respondents City of Bandon and Matt Winkel. With him on the brief was Harrang Long Gary Rudnick P.C.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent State of Oregon/Department of Environmental Quality. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Deits, Chief Judge,* and Armstrong and Brewer, Judges.

BREWER, J.

---

* Deits, C. J., *vice* De Muniz, P. J., resigned.

**BREWER, J.**

Plaintiff brought this action for declaratory and other relief against defendants City of Bandon and its city manager (collectively "the city") and the state of Oregon, acting through its Department of Environmental Quality (DEQ). Plaintiff contended that various enactments and actions by the city, taken in part pursuant to a loan agreement between the city and DEQ, violated city charter limitations on water and sewer rates, both facially and as applied to plaintiff's commercial property. The trial court entered judgment for defendants. Plaintiff appeals, and we affirm in part and reverse in part.

In 1992, DEQ loaned the city $1.5 million to finance a wastewater treatment plant. *See* Or Const, Art XI-H; ORS ch 468. The transaction took the form of a "revenue secured loan," and the parties' loan agreement contains the following "rate covenant":

"[1.5] (a) The Borrower covenants with the DEQ and any assignee of this Loan Agreement that the Borrower shall charge fees in connection with the operation of the Sewer System which are adequate to generate Net Operation Revenues in each fiscal year at least equal to the sum of:

"(I) All amounts required to make required deposits to the Debt Reserve Account in that fiscal year; plus either (ii) or (iii), below:

"(ii) One hundred five percent (105%) of the payments due under this Loan agreement in that fiscal year; or

"(iii) Amounts necessary so that the separate Bond and Interest Funds shall end each fiscal year with a minimum of one hundred five [percent] (105%) of the principal and interest payments due under this Loan Agreement in the following fiscal year."

In 1995 the voters of the city enacted an initiative measure that added the following provisions to the charter:

**"Section 47.  Limits on Water Rates Established.**
Except by consent of the voters, any increase in water rates

in excess of rates in effect on September 1, 1994, are revoked.

**"Section 48. Limits on Sewer Rates Established.** Except by consent of the voters, any increase in sewer rates in excess of rates in effect on September 1, 1994, are hereby revoked.

**"Section 49. Voter Approval Required for New Taxes and Fees.** Except by consent of the voters, the City Council shall not impose any new tax or new user fee, nor increase any tax, utility rate, user fee or other charge exceeding taxes, rates, fees and charges in effect on February 13, 1995. Except by consent of the voters any new taxes or new user fee, and any increase in taxes, utility rates, fees and charges exceeding those in effect on February 13, 1995, are hereby revoked. The City Counsel retains authority to increase electric utility rates to cover the cost of rate increases charged to the City of Bandon by the Bonneville Power Administration or other like electric providers and to raise taxes as allowed by the Oregon Constitution." (Emphasis in original.)

In response, the City Council adopted legislation to reduce sewer rates to the levels in effect on September 1, 1994. DEQ then apprised the city that it was in violation of the loan agreement. The city, in turn, enacted further legislation that raised sewer rates above the 1994 rates and to the amounts projected as necessary to comply with the agreement. In his first claim, plaintiff asserted that the raise in rates violated sections 48 and 49 of the charter. Defendants interposed the affirmative defense that:

"1. Sections 48 and 49 of the city Charter of the City of Bandon are void and preempted by Article XI-H of the Oregon Constitution and ORS Chapters 468 and 288 to the extent that they purport to deny the City of Bandon the ability to set and collect sewer rates required to discharge its obligations to the Department of Environmental Quality."

The trial court granted defendants' motion for summary judgment as to the first claim on the basis of that defense.

The situation concerning water rates is somewhat more complicated. The rates in effect on September 1, 1994,

had been set by the council's 1991 Resolution No. 91-34. The categories and rates that it established were, as material:

"1.  Residential/Commercial/Industrial
       Basic charge                                     $6.80
       Rate per 1000 gal. water                        0.815

"2.  Extra Unit Charge per unit after 1st
       Apartment/Duplex                                 4.08
       Trailer Park                                     2.04
       Motel/Bed, Breakfast & RV Park                  0.63"

Thus, the "extra unit charge" was not expressly made applicable to customers denominated as "commercial" generally, other than the six commercial uses specifically listed. In its brief, the city notes that the 1987 resolution that the 1991 resolution replaced had used the term "Apartments and Commercial" where the latter refers to "Apartment/Duplex." The brief states that the term was changed "for an unknown reason."

By two resolutions adopted in 1995, enacted before the initiative election but necessarily after September 1, 1994, the city sought to "clarify" its intent that the extra (or multiple) unit charge was applicable—and had been applicable under previous legislation, *e.g.*, the 1991 resolution—to commercial customers with more than one unit, for example, users like plaintiff with commercial tenants. In his second claim, plaintiff sought a declaration that the multiple-unit rate categories established after September 1, 1994, were contrary to sections 47 and 49 of the charter, insofar as the city sought to apply them to customers who had not been subject to those rates under the previous legislation. In his third through fifth claims, plaintiff asked for injunctive, monetary and declaratory relief in connection with various city administrative actions assessing or enforcing the multiple-unit rates for services to plaintiff's property.[1] The trial court granted summary judgment for defendants on the third,

---

[1] The multiple-unit rate claims affected sewer as well as water services in some circumstances. As plaintiff's complaint draws them, the lines between the second claim and the remaining ones are not as straight as our description would make them seem. However, the trial court and—at least now—the parties seem to agree that the claims should be treated as we describe them.

fourth and fifth claims, on the ground that the exclusive means for challenging the actions to which they pertain was by writ of review. After a trial on the merits, the court also rejected plaintiff's second claim.

■     In his argument to us, plaintiff assigns error to each of the adverse rulings described above.[2] He asserts in his first assignment that the court erred in its conclusion that state law preempts the portions of sections 48 and 49 that pertain to sewer rates. In support of their preemption defense, defendants relied, in part, on ORS 468.437(1), ORS 468.439 and ORS 288.594. The first of those statutes provides:

> "Any public agency receiving a loan from the Water Pollution Control Revolving Fund shall establish and maintain a dedicated source of revenue or other acceptable source of revenue for the repayment of the loan."

The second provides, in part:

> "Notwithstanding any limitation contained in any other provision of law or local charter, a public agency may:
>
> "* * * * *
>
> "(2)   Enter into loan agreements and make related agreements with the department in which the public agency agrees to repay the borrowed money in accordance with the terms of the loan agreement;
>
> "(3)   Covenant with the department regarding the operation of treatment works and the imposition and collection or rates, fees and charges for the treatment works;
>
> "(4)   Pledge all or part of the revenues of the treatment works to pay the amount due under the loan agreement and notes in accordance with ORS 288.594[.]"

ORS 288.594 provides:

> "(1)   If a public body is authorized by law to pledge its revenues or other funds to secure bonds or other obligations, the pledge shall be valid and binding from the time the pledge is made, revenues and other funds so pledged shall be immediately subject to the lien of the pledge without physical delivery, filing or other act and the lien of pledge shall be superior to all other claims and liens of any

---

[2] He also makes one other assignment, which we reject without discussion.

kind whatsoever. Any initiative or referendum measure approved by the electors of the public body that changes statutory or municipal charter provisions affecting rates, fees, tolls, rental or other charges shall not be given any force or effect if to do so would impair existing covenants made with holders of existing bonds or other obligations regarding the imposition, levy or collection of such rates, fees, tolls, rentals or other charges pledged to secure outstanding bonds or other obligations.

"(2)   If a public body is authorized by law to pledge its revenues to secure revenue bonds or other borrowings, the public body may enter into rate covenants. Rate covenants authorized by this subsection may obligate the public body to impose rates and charges that generate pledged revenues each year in amounts at least equal to operations and maintenance expenses of the system that produces the pledged revenues, plus debt service on the revenue bonds and other borrowings, plus an additional amount that is reasonably required to obtain favorable terms for the revenue bonds and other borrowings. Without regard to whether a rate covenant was entered into before or after October 23, 1999, a rate covenant authorized by this subsection shall bind the public body making the rate covenant and shall be enforceable against the public body in accordance with the terms of the rate covenant."

Also relevant is ORS 288.517, which declares the nonimpairment of covenants of this kind "by subsequent initiative * * * measures" to be a "matter of statewide concern."

Defendants' affirmative defense and the parties' arguments on the preemption issue are narrow. Plaintiff does not argue that the state statutes are facially unconstitutional as an invasion of the city's home rule powers or the city voters' initiative rights. *See* Or Const, Art XI, § 2; Art IV, § 1(5). Rather, plaintiff's contention is that the city charter provisions are not preempted because, as applied here, there is no inconsistency between their operation and the operation of the statutes. Similarly, defendants' argument is not that sections 47 through 49 of the charter are wholly preempted by the statutes. Rather, their argument is that the charter provisions are preempted only insofar as they do or have been applied to impair *this* loan agreement. In many respects, the disagreement is more of a contract dispute than a preemption

issue, but it takes on the appearance of the latter because the state has enacted statutes to supplement and strengthen the negotiated terms of its own contracts.

Whether or not the parties might have formulated their positions more broadly, the narrow arguments they do make are sufficient to the decision of plaintiff's first claim and his first assignment of error. The statutes are preemptive to the extent of their inconsistency with the charter provisions, regardless of whether they have any broader preemptive effect. *See La Grande / Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *on rehearing* 284 Or 173, 586 P2d 765 (1978). Stated another way, the statutes preempt the local provisions, *at least* insofar as the application of the local provisions actually reduced the available funding to a level less than necessary for the city's satisfactory performance of the contract. Although plaintiff disagrees with that proposition, he bases his argument almost entirely on the statutes in ORS chapter 468 that we have discussed. He makes no reference in his opening or reply brief to ORS 288.594, which expressly provides that "charter provisions affecting rates * * * shall not be given any force or effect if to do so would impair existing covenants" like those in the loan agreement. The uncontested evidence in the record, which was contained in the city manager's affidavit, was that the city's reduction of rates to 1994 levels, pursuant to the charter provisions, left inadequate funding for the city's performance of the loan agreement. Consequently, under the applicable law and the facts of this case, we hold that the statutes preempt the charter provisions, and we reject plaintiff's first assignment.

■ We turn next to his third assignment, in which he challenges the trial court's adverse ruling on his second claim, *i.e.*, that the city's extension of the multiple-unit rates to existing commercial customers, after the enactment of the initiative, was inconsistent with the new charter provisions. Plaintiff argues that the rate legislation that was in effect in September 1994 and February 1995 expressly included "Commercial" users in its paragraph relating to basic water rates but, rather than *categorically* including all multiple-unit commercial uses in its "extra unit charge" paragraph, specified only Apartment/Duplex, Trailer Park, Motel/Bed,

Breakfast & RV Park as the types of commercial or noncommercial uses that were subject to that charge. Hence, commercial buildings of the kind operated by plaintiff were not subject to the multiple-unit rates as of the dates set forth in the charter provisions and could not later be made subject to the rates without a popular vote consistent with those provisions.

The city answers, as stated in its brief:

"As shown by the trial court's careful reading of sections 47 and 49, these sections do not even apply to, let alone prohibit, the creation of new categories of multiple-unit base rates. Section 47 simply prohibits Bandon's City Council from *increasing* water rates above the rates in effect on September 1, 1994. The rates currently in effect, set forth in Resolution No. 95-57, are exactly the same as those in Resolution 91-34, which were the rates in effect on September 1, 1994. Section 47 says nothing about the authority of the City Council to develop new categories of users. Section 47 would come into play only if users in those new categories were required to pay rates in excess of the rates in effect on September 1, 1994.

"* * * * *

"The multiple-unit base rate for additional units paid by those in the category of 'Commercial Office Buildings,' such as plaintiff, are not in excess of the rates in effect on February 13, 1995, or September 1, 1994, or any other multiple-unit base rate payer. As such, the rate being charged to plaintiff does not violate section 49." (Emphasis in original.)

The trial court agreed, and explained in an opinion letter that the 1995 council resolution extending the multiple-unit rates to commercial businesses (Resolution 95-11)

"does not increase water rates. The rate for the basic charge, the 1,000 gallons of water, and multiple units is the same as existed on September 1, 1994. Resolution 95-11 merely specifies the types of businesses to which the rate applies. No rate increase occurred. Revenue to the city may have increased, but section 47 does not prohibit an increase in revenue to the city and does not prohibit the addition of units or businesses to which the rate applies."

In other words, as interpreted by the city and the trial court, section 47 does not prohibit the city from placing an existing customer into a category with higher rates than those to which the customer was subject on September 1, 1994, even though none of the material characteristics of the customer have changed, as long as the rates *within* the newly applied category are the same as they were on September 1, 1994. We disagree with that interpretation, and we agree with plaintiff that an expansion of the types of existing customers to which the higher rates apply would be nothing more than a prohibited rate increase that the city may not shield by using a different label for it.

The city argues that the post-1994 changes, rather than being substantive in nature, are "clarifications" that simply "interpret" the 1991 resolution itself as having already included commercial customers like plaintiff in the category subject to the multiple-unit rates. The city also asserts that the courts must "defer" to that interpretation of the city's own legislation.

The city's deference argument is derived from cases involving appeals from local land use decisions under ORS chapter 197. As we explained in *State ex rel Coastal Management v. Washington Cty.*, 159 Or App 533, 542, 979 P2d 300 (1999), the deference principle has no application—at least as a limitation on review—outside that context. In *Lincoln Loan Co. v. City of Portland*, 317 Or 192, 199, 855 P2d 151 (1993), the Supreme Court stated that "the meaning of a statute is [a question] of law for the court," and that the "same rules that govern the construction of statutes apply to the construction of municipal ordinances."

Be that as it may, however, we agree with plaintiff that the 1991 resolution that set the rates in effect on September 1, 1994, cannot be interpreted as including commercial operations like plaintiff's office building in the category of customers to which the multiple-unit rates apply. "Commercial" uses are expressly included among those that are generally subject to the basic rates under the first paragraph of the 1991 resolution. The next paragraph, pertaining to the "extra unit" (or "multi-unit") charges, sets forth six *specific* operations, all of which can be commercial in nature, but it

does not purport to make any other or unenumerated kind of commercial operations subject to the charge. The resolution cannot be interpreted in the manner that the city urges without violating the basic admonition against inserting into legislation what the enacting body did not include in it. *See* ORS 174.010. We conclude that the multiple-unit water rate was not assessable against plaintiff's business on September 1, 1994, and that it therefore could not be assessed against the business by subsequent action of the city council, consistently with section 47 of the charter. We therefore hold that the trial court erred in entering judgment for defendants on plaintiff's second claim.

Plaintiff also assigns error to the trial court's ruling that plaintiff's third, fourth and fifth claims were subject exclusively to the writ of review and could not be pursued in this action. We agree with the trial court's ruling and its dismissal of the third through fifth claims. We note, however, that some of the essential relief that plaintiff sought in those claims also falls within the scope of his second claim.

Reversed and remanded on second claim for further proceedings not inconsistent with this opinion; otherwise affirmed.