Argued and submitted March 12, affirmed June 18, 2008

David POVEY,
LaVonne Povey,
and Owen Minnick,
*Plaintiffs-Appellants,*

*v.*

CITY OF MOSIER,
an Oregon municipal corporation,
*Defendant-Respondent.*

Wasco County Circuit Court
0500283CC; A133868

188 P3d 321

Jonathan M. Radmacher argued for appellants. With him on the briefs was McEwen Gisvold LLP. With them on the reply brief was Erin M. Lillis.

Daniel Kearns argued the cause for respondent. With him on the brief was Reeve Kearns, PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

The dispute in this case involves an agreement between the former owners of plaintiffs' property and the City of Mosier, under which the city granted the former owners approval to partition the property on the condition that, when they or their successors-in-interest developed the resulting parcels, they or the successors had to construct, and dedicate to the city, a road serving those parcels. Plaintiffs, planning to develop the parcels and seeking to avoid the road-building and dedication obligation, brought an action seeking a declaration that the agreement was void because it did not comply with statutes establishing requirements for "development agreements." ORS 94.504 - 94.528. Plaintiffs and defendant filed cross-motions for summary judgment. The trial court denied plaintiffs' motion and granted defendant's, and plaintiffs appeal. Because the material facts are undisputed, we review the trial court's judgment for errors of law, *Oregon Southwest, LLC v. Kvaternik*, 214 Or App 404, 413, 164 P3d 1226 (2007), *rev den*, 344 Or 390 (2008), and we affirm.

■ The statute at the center of this case, ORS 94.504 provides, in part:

"(1) A city or county may enter into a development agreement as provided in ORS 94.504 to 94.528 with any person having a legal or equitable interest in real property for the development of that property.

"(2) A development agreement shall specify:"

The rest of the statute consists of paragraphs (2)(a) through (L) and subsections (3) through (8), all of which deal with the contents, duration, and other characteristics that the agreement "shall" have. The agreement between plaintiffs' predecessors and defendant does not contain some of those characteristics. Acknowledging the phrase "*may* enter into a development agreement" in paragraph (1), the parties agree that local governments and developers do not have any statutory obligation to enter into development agreements. (Emphasis added.) Plaintiffs, however, maintain that, once a local government and a developer do decide to enter into a development agreement, defined as any agreement that

deals in any fashion with anything that could be called the "development" of real property, the agreement *must* conform to all of the requirements of ORS 94.504. Defendant argues that the statute creates an optional "planning tool," a nonexclusive, statutory mechanism that local governments and private property owners can employ at their discretion—that is, a "statutory" development agreement, as distinct from other forms of development agreements not described by statute. The agreement in this case, defendant asserts, is not a statutory development agreement but a valid nonstatutory agreement enforceable according to its terms. As explained below, we agree with defendant.

At its most basic level, the disagreement is over the textual interpretation of ORS 94.504(1) and (2), in particular, the interplay between the word "may" in subsection (1) and "shall" in subsection (2). Plaintiffs paraphrase the subsections as follows: "A city or county *may* enter into a development agreement *only* as provided in ORS 94.504 to 94.528. * * * Such a development agreement *shall* conform to the following requirements." In defendant's paraphrase, on the other hand, the word "may" modifies the entire phrase, "enter into a development agreement as provided in ORS 94.504 to 94.528." The statute, in other words, provides that "a city or county *may, if it so chooses,* enter into an agreement *of the type that is described* in ORS 94.504 to 94.528, that is, an agreement that conforms to the specified criteria." The implication, according to defendant, is that there are other types of agreements, and local governments may choose to use those types instead of the type described in ORS 94.504 to 94.528.

Grammatically, either interpretation is plausible. The legislative history, however, demonstrates that, in enacting ORS 94.504 to 94.528, the legislature intended to expand local governments' and developers' options, not limit them. According to proponents (and there were no opponents—at least none who testified or voted), the statutes were designed to create a wholly optional opportunity for local governments to enter into long-term, multiphase land development agreements with property owners.

Jon Chandler, staff attorney for Common Ground, the bill's primary proponent, testified that the legislation would create "a *voluntary system*," stating, *"There's no requirement that anybody do it.* We hope it will be used. We think it will be used." Tape Recording, House Committee on General Government, Subcommittee on Government, HB 3045, May 5, 1993, Tape 66, Side B ("House Committee Tape Recording") (statement of Jon Chandler) (emphases added). He summarized the bill as follows:

> "HB 3045 is designed to give local government and developers a new tool—development agreements. These agreements will give local governments a new planning mechanism * * *.
>
> "* * * * *
>
> "There is no burden placed on local governments by this bill, since *development agreements would be optional and voluntary. Nothing in this bill requires local governments to change existing systems.* HB 3045 simply provides a means for local governments and developers to work together * * *. We believe that this tool will be used frequently * * *."

Testimony, House Committee on General Government, Subcommittee on Government, HB 3045, May 5, 1993, Ex F (statement of Jon Chandler) (emphasis added).

In arguing that statutory compliance is mandatory, plaintiffs focus on a portion of Chandler's testimony in which he stated that what is now codified as ORS 94.504(2) contains "a list of things the development agreement *has to specify in order for it to be enforceable at the outset.*" Tape Recording, Senate Committee on Labor and Government Operations, HB 3045, July 19, 1993, Tape 185, Side A (statement of Jon Chandler) (emphasis added). Considered together with Chandler's other remarks, however, it is clear that he was referring not to the enforceability of all agreements concerning the development of land but to the enforceability of that unique statutory development agreement authorized by ORS 94.504 to 94.528.

Most significantly, the legislative history demonstrates that proponents believed that statutory development agreements were necessary in order to reassure skittish city

attorneys and developers. The members of the House Committee on General Government, Subcommittee on Government, heard the committee administrator explain that "[t]he intent [of the bill] is to allow an agreement on the standards that will be in place during the development so the developers can proceed without wondering whether the rules are going to change part way through." House Committee Tape Recording. Chandler testified before that subcommittee:

> "There's been some question raised as to whether or not this [legislation] is actually necessary * * *. I believe it is. A lot of city attorneys and county counsel believe that you cannot legally bind successor commissions or councils, consequently they're unwilling to enter into long-term agreements.
>
> "What this bill will do is allow the city or the county and the developer to sit down on the front end of a multi-phase project and decide how it's going to run. Where the parks are going to go, for example, what kind of sidewalk standards are going to be in place, what sort of pedestrian linkages are going to occur. Not just for the first phase that's in front of them but for phase 6 or 7 or 10 that may not happen for three or four years.
>
> "And to give the legal authority to the city, making it very clear that they can in fact enter into these sorts of agreements[.]"

*Id.* (statement of Jon Chandler). As the full committee's clerk later summarized the subcommittee testimony: "Witnesses testify that city attorneys are unwilling to bind future councils into any kind of standards like these without such authority in the statute." Tape Recording, House Committee on General Government, HB 3045, May 13, 1993, Tape 34, Side A. In response, one representative agreed that "city attorneys are notoriously cautious * * *. I believe that allowing this—this kind of agreement will help cities be more innovative and collaborative in the way that they work with development issues * * *." *Id.* (statement of Rep Sharon Wiley). No contrary or conflicting opinions were expressed on the Senate side.

■      Thus, the legislative history indicates that the purpose of the bill was to create a "safe harbor" for government

attorneys and developers who feared that, without such leg-
islation, agreements for future development would be suscep-
tible to attack as unlawful attempts to bind future councils.[1]
Nothing in the legislative history indicates that ORS 94.504
to 94.528 was intended to prevent less cautious parties, or
parties to agreements that did not invite invalidation based
on binding future councils, from entering into agreements
that did not meet the requirements of statutory development
agreements. The legislation, in other words, was designed to
increase options, not to reduce them. Thus, contrary to plain-
tiffs' contention, ORS 94.504 is not a legal nullity, conformity
with which brings no benefits and violation of which brings
no consequences. Rather, local governments and developers
that choose to enter into statutory development agreements
achieve the security of knowing that the agreement cannot
successfully be attacked as an unlawful attempt to bind a
future lawmaking body. Local governments and developers
that choose to use different forms of agreement remain sus-
ceptible to such attacks—which is not to suggest, we add,
that such attacks are or could be successful, a question that
this case does not present.

■       Further, even if the legislative history does not
resolve all ambiguity in favor of defendant—the history is not
only sparse, but consists mostly of statements by nonlegisla-
tors—considerations rooted in Oregon's constitutional home
rule provisions militate in favor of the same outcome. If we
were to conclude that plaintiffs' interpretation is correct,
ORS 94.504 to 94.528 would impose mandatory require-
ments on all local government development agreements,
including the requirement that such agreements be enacted
as ordinances. That interpretation would conflict with the
local government's home rule authority to enact nonconform-
ing agreements. In keeping with Oregon's home rule juris-
prudence, we "assume that the legislature does not mean to

---

[1] Thus, ORS 94.504(5) provides:

"A development agreement shall contain a provision that makes all city or
county obligations to expend moneys under the development agreement con-
tingent upon future appropriations as part of the local budget process. The
development agreement shall further provide that nothing in the agreement
requires a city or county to appropriate any such moneys."

displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent." *LaGrande/Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *adh'd to on reh'g*, 284 Or 173, 586 P2d 765 (1978).

Affirmed.