Argued and submitted December 10, 2020; on appeal, affirmed; on cross-appeal, dismissed as moot; motion to dismiss cross-appeal dismissed as moot November 16, 2022

URBAN RENEWAL COMMISSION
OF THE CITY OF OREGON CITY,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

John F. WILLIAMS, Jr.,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

Thomas J. O'BRIEN,
*Defendant,*

*and*

CITY OF OREGON CITY,
a municipal corporation of the State of Oregon,
*Defendant-Respondent*
*Cross-Respondent.*

URBAN RENEWAL COMMISSION
OF THE CITY OF OREGON CITY,
*Plaintiff-Respondent*
*Cross-Respondent,*

*v.*

John F. WILLIAMS, Jr.,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

Thomas J. O'BRIEN,
*Defendant,*

*and*

CITY OF OREGON CITY,
a municipal corporation of the State of Oregon,
*Defendant-Respondent*
*Cross-Appellant.*

Clackamas County Circuit Court
16CV42887; A167583

521 P3d 494

This declaratory judgment action concerns a local initiative that amended the Oregon City Charter, adding section 59E, which purports to restrict urban renewal activities in the city. Defendant Williams was a proponent of the initiative. The Urban Renewal Commission of the City of Oregon City (URC) brought this action, seeking to have section 59E declared unconstitutional and preempted by state law. On cross-motions for summary judgment, the trial court granted summary judgment to Williams on URC's constitutional claim and granted summary judgment to URC on its preemption claim. Williams appeals and URC and the city cross-appeal. *Held*: Section 59E is preempted by ORS chapter 457, ORS chapter 457 does not violate the city's home rule, and nothing of section 59E survives those conclusions. Based on that disposition, the court did not address the cross-appeal.

On appeal, affirmed; on cross-appeal, dismissed as moot; motion to dismiss cross-appeal dismissed as moot.

Michael C. Wetzel, Judge.

Jesse A. Buss argued the cause and filed the briefs for appellant-cross-respondent.

Gabriel M. Weaver and William K. Kabeiseman argued the cause for respondents-cross-appellants and respondents-cross-respondents. Also on the joint combined answering and cross-opening brief were Ciaran P. A. Connelly and Ball Janik LLP; and Bateman Seidel Miner Blomgren Chellis & Gram, P.C. On the joint reply brief on cross-appeal were William K. Kabeiseman and Bateman Seidel Miner Blomgren Chellis & Gram, P.C.; and Gabriel M. Weaver and Ball Janik LLP.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

ORTEGA, P. J.

On appeal, affirmed; on cross-appeal, dismissed as moot; motion to dismiss cross-appeal dismissed as moot.

## ORTEGA, P. J.

This declaratory judgment action concerns a local initiative that amended the Oregon City Charter, adding section 59E, which purports to restrict urban renewal activities in the city. Defendant Williams was a proponent of the initiative. The Urban Renewal Commission of the City of Oregon City (URC) brought this declaratory judgment action against Williams and the City of Oregon City, seeking to have section 59E declared unconstitutional under Article IV, section 1(5), of the Oregon Constitution, and declared preempted by the urban renewal statutes in ORS chapter 457. The city, although a defendant in the action, is aligned with URC's position in this case. On cross-motions for summary judgment, the trial court granted summary judgment to Williams on URC's claim that section 59E violates Article IV, section 1(5), and granted summary judgment to URC on its preemption claim, declaring that section 59E was preempted and unenforceable. Williams appeals from the judgment, arguing that section 59E is not preempted by state law. URC and the city cross-appeal, arguing that section 59E violates Article IV, section 1(5). On Williams's appeal, we affirm the trial court, concluding that section 59E is preempted by ORS chapter 457, that ORS chapter 457 does not violate the city's home rule, and that nothing of section 59E survives that conclusion. Based on that disposition, we dismiss as moot both the cross-appeal and Williams's motion to dismiss the cross-appeal for lack of jurisdiction.

The relevant facts are undisputed. Williams was the proponent of a local initiative to amend the Oregon City Charter, the purpose of which was to curtail urban renewal activities in the city. The voters passed the initiative in 2016 and it became section 59E in the city charter. Section 59E provides:

"After June 30, 2016, the City of Oregon City, the Urban Renewal Agency of the City of Oregon City, or any agency created in whole or in part by the city, whether acting alone or in concert with other persons, entities or agencies:

"(a)   Shall not finance, or authorize the financing of, any urban renewal plan or project, in whole or in part, with tax increment financing revenues,[1]

"(b)   Shall not borrow or spend, or authorize the borrowing or spending of, money to buy land or property for the purpose of urban renewal, or the development of property not owned by the city.

"(c)   Shall use any and all existing tax increment revenues solely for the purpose of retiring existing Urban Renewal Agency debt."

URC operates under a current urban renewal plan approved by the city. That plan provides for tax increment financing for urban renewal projects and for URC to acquire property for those projects. Shortly after the voters adopted section 59E, URC brought this declaratory judgment action seeking to invalidate it. URC alleged that section 59E was invalid under Article IV, section 1(5), as an administrative, and not legislative, action and was preempted by ORS chapter 457. URC moved for summary judgment on both bases, and Williams cross-moved for summary judgment.

The trial court first concluded that section 59E was legislative in nature because the prohibitions contained in that section "are policy decisions of general applicability and of a lasting duration." As a result, it granted summary judgment to Williams on URC's claim that section 59E was

---

[1] The Supreme Court has explained the basics of tax increment financing:

"'In simplified terms, a local government adopts an urban renewal plan to improve a blighted area. Typically, the local government sells bonds to redevelop the blighted area. When the area has been redeveloped, it should have a higher value for property taxation than prior to redevelopment.

"'When an urban renewal plan is adopted, the assessor determines and certifies the assessed value of all the taxable property in the urban renewal area as of the assessment date immediately prior to approval of the urban renewal plan. ORS 457.430. This amount becomes the certified or "frozen value" from which the units of local government continue to collect property taxes. Taxes derived from any increase in value over the "frozen value" are dedicated to paying for redevelopment of the area. ORS 457.440(6).

"'Taxes for urban renewal are not levied by an urban renewal agency. Rather, they result from operation of the statutes.'"

*City of Portland v. Smith*, 314 Or 178, 183-84, 838 P2d 568 (1992) (quoting *City of Portland v. Smith*, 12 OTR 208, 210-11 (1992) (footnote omitted in original; bracketed footnote omitted)).

unconstitutional. The trial court next concluded that all three parts of section 59E are preempted by ORS chapter 457 because the two laws could not operate concurrently. Because the court determined that all parts of section 59E are preempted, the court did not reach Williams's arguments regarding severing the preempted portions such that the remainder of section 59E could remain enforceable. The court therefore granted summary judgment to URC on that basis. The court entered a judgment declaring:

"1.    Section 59E of the Oregon City Charter is legislative in nature.

"2.    Section 59E is preempted by ORS Chapter 457. Section 59E cannot operate concurrently with ORS Chapter 457. The Court does not reach the question of the severability of the provision of [section] 59E.

"3.    Section 59E of the Oregon City Charter is not enforceable."

This appeal and cross-appeal followed.

As explained in *La Grande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978):

"[T]he validity of local action depends, first, on whether it is authorized by the local charter or by a statute, or if taken by initiative, whether it qualifies as 'local, special (or) municipal legislation' under [A]rticle IV, section 1(5); second, on whether it contravenes state or federal law."

URC and the city's cross-appeal addresses the first half of that inquiry and Williams's appeal addresses the second. Because we conclude on Williams's appeal that the trial court did not err, we do not reach the cross-appeal or Williams's motion to dismiss the cross-appeal.

On appeal, Williams argues that section 59E is not preempted by ORS chapter 457 because both laws can be complied with concurrently. Williams asserts that ORS chapter 457 only authorizes the creation of an urban renewal program and that it does not require a program or that the program has certain features. Because section

59E, Williams argues, only has placed certain policy limits on the city's program, it is not in conflict with ORS chapter 457. Williams further argues that, even if the two laws are in conflict, section 59E controls under the city's home rule. Finally, Williams argues that, even if section 59E does not control, the trial court should have severed the preempted portions of section 59E and preserved the remainder.

URC responds that Williams is viewing the issue with the wrong frame because URC is a separate public body from the city under ORS chapter 457. As such, URC argues that it is not governed by the city charter; it is governed by the urban renewal plan, and the city—through section 59E of the city charter—cannot take away powers from URC that are authorized in the current plan without amending the plan using the process set forth in ORS chapter 457. As a result, URC asserts, ORS chapter 457 expressly preempts section 59E, or, to the extent it is not expressly preempted, it is implicitly preempted, because section 59E is fundamentally incompatible with the statutory scheme. Finally, URC responds that Williams did not properly preserve his severance argument and, to the extent he did, all of section 59E is preempted.

In addressing the parties' arguments, we start with the legal framework we must apply to determine whether section 59E contravenes state law. *La Grande/Astoria*, 281 Or at 142. *La Grande/Astoria* explains the analytical process:

> "[T]he first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent. However, when a local enactment is found incompatible with a state law in an area of substantive policy, the state law will displace the local rule."

*Id*. at 148-49 (internal citations omitted). Thus, the question is whether section 59E is incompatible with ORS chapter

457, "either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *Id.* If a party is relying on the latter, the legislative intention to preempt local laws must be unambiguous. *Rogue Valley Sewer Services v. City of Phoenix*, 357 Or 437, 454, 353 P3d 581 (2015).

We turn to ORS chapter 457, which contains a comprehensive scheme for urban renewal. ORS 457.035 creates an urban renewal agency in each municipality:

> "In each municipality, as defined in ORS 457.010, there hereby is created a public body corporate and politic to be known as the 'urban renewal agency' of the municipality. However, the urban renewal agency shall not exercise its powers until or unless the governing body of the municipality, by nonemergency ordinance, declares that blighted areas exist in the municipality and that there is need for an urban renewal agency to function in the municipality and elects to have the powers of an urban renewal agency exercised in any of the three ways provided in ORS 457.045."

ORS 457.035(1).[2] Municipality is defined as "any county or city in this state. 'The municipality' means the municipality for which a particular urban renewal agency is created." ORS 457.010(10). Once activated, the urban renewal agency "shall have authority to exercise its powers within the same area of operation given a housing authority of the municipality under ORS 456.060." ORS 457.035(2). Under ORS 456.060, the "area of operation" includes the area within the city, but also includes areas outside the territorial boundaries of the city when the statutory circumstances apply.[3]

_____

[2] Under ORS 457.045, the municipality can make the agency part of the housing authority, a separately appointed board or commission, or part of the municipality's governing body itself, "provided, however, that any act of the governing body acting as the urban renewal agency shall be, and shall be considered, the act of the urban renewal agency only and not of the governing body."

[3] Under ORS 456.060(1)(a), for a housing authority for the city, the "area of operation" includes:

"(A) The area within the city;

"(B) If the city has adopted in its comprehensive land use plan an urban growth boundary recognized by the governing bodies of the counties in which it is situated, the area within that urban growth boundary; and

"(C) Unless a county has an existing housing authority which is operating and substantially addressing the need for housing in the county for

Urban renewal agencies are required to carry out an approved urban renewal plan and may exercise statutorily described powers to do so. ORS 457.220 ("[A]n urban renewal agency shall carry out the urban renewal plan approved under ORS 457.095."); ORS 457.170 (providing that an urban renewal agency "may plan or undertake any urban renewal project to carry out an approved urban renewal plan" and setting out the powers an urban renewal agency has "[i]n planning or undertaking an urban renewal project"); *see also* ORS 457.180 (enumerating other powers of an urban renewal agency); ORS 457.190 (enumerating ways in which urban renewal agencies may obtain financing for urban renewal projects).

Urban renewal plans are proposed by the agency, ORS 457.085, and approved, by ordinance, by the municipality, ORS 457.095. *See also* ORS 457.085 (required contents of a proposed urban renewal plan); ORS 457.087 (required contents of the report required to accompany a proposed urban renewal plan). Before approval by the municipality, the agency must first make the plan subject to public involvement in the development of the plan and obtain recommendations from the municipality planning commission and from affected taxing districts. ORS 457.085(1); ORS 457.089. "The governing body of a municipality, upon receipt of a proposed urban renewal plan and report from the municipality's urban renewal agency and after public notice and hearing and consideration of public testimony and planning commission and taxing district recommendations, if any, may approve the urban renewal plan." ORS 457.095(1); *see also* ORS 457.120 (requiring public notice and individual notice to certain households, electors, and property owners). In the approval ordinance, the municipality must make specific findings, including, among other things, the necessity for the plan, the necessity for property

persons of lower income, the area within 10 miles from the territorial boundaries of the city, excepting any area which lies within the territorial or urban growth boundaries of some other city which has by ordinance prohibited such operation within the city or its urban growth boundaries because the city finds that:

"(i) An existing public agency operating within the area is substantially addressing the need for housing in the city for persons of lower income; or

"(ii) There is no need for housing in the city for persons of lower income."

acquisition if provided for in the plan, and that "[t]he municipality shall assume and complete any activities prescribed it by the urban renewal plan." ORS 457.095(2). Additionally, an urban renewal plan may provide for tax increment financing for urban renewal projects as provided in ORS 457.420 to 457.470. Such financing cannot be used if it is not in the approved plan. ORS 457.420(1).

An urban renewal plan can be amended by the urban renewal agency without city approval, ORS 457.220, except that "[a]ny substantial change made in the urban renewal plan shall, before being carried out, be approved in the same manner as the original plan," ORS 457.220(2).[4] The plan is required to contain "[a] description of what types of possible future amendments to the plan are substantial amendments" that require the notice, hearing, and approval process under ORS 457.095. ORS 457.085(2)(i). Once a plan is approved, it is "conclusively presumed valid for all purposes 90 days after adoption" and "[n]o direct or collateral attack on the action may thereafter be commenced." ORS 457.135.

A municipality can, by ordinance, terminate an urban renewal agency and transfer its "facilities, files and personnel" to the municipality if it "finds that there no longer exists a need for an urban renewal agency in the municipality." ORS 457.075. An agency cannot be terminated unless all indebtedness to which tax increment financing is irrevocably pledged for payment is fully paid. *Id.*

With that background in mind, we first turn to an issue that is present throughout Williams's argument on appeal—whether URC is controlled by the city's charter. It has long been settled that, under ORS chapter 457, urban renewal agencies are separate entities from the municipal government itself. *See, e.g.*, *Housing Auth. of Lane County v. Bd. of Comm'rs*, 35 Or App 785, 787, 582 P2d 844 (1978), *rev den*, 285 Or 73 (1979). We have recognized that, although a municipality retains the power to designate what entity

_____

[4] An urban renewal agency is also limited in the extent of amendments it can make, without it being a substantial amendment, that add to the urban renewal area or increase the maximum indebtedness allowed under the plan. ORS 457.220(3) - (4); *see also* ORS 457.085(2)(i)(A) - (B).

shall act as the urban renewal agency, to approve urban renewal plans and substantial amendments to plans, and to terminate the agency if there is no remaining need for it, "[t]he independence of the urban renewal agency from its municipality is nevertheless emphasized in the statutory scheme." *Umrein v. Topaz*, 61 Or App 601, 604, 658 P2d 568, *rev den*, 294 Or 792 (1983).

Williams, however, argues that URC is not wholly independent from the city and, thus, is subject to the city's charter, much like a political subdivision of the state is still subject to the Oregon Constitution. He asserts that, because ORS chapter 457 required the city to act pursuant to its ordinance power under the city charter to authorize URC to exercise its powers and to approve the urban renewal plan, URC, although separate from the city, is still subject to the ultimate source of authority in the city, the city charter. URC responds that it is an independent body and not a political subdivision of the city and is thus not subject to direct regulation by the city, except for the powers reserved to the city in ORS chapter 457.

We agree with URC. When we concluded that urban renewal agencies are separate entities from the municipality for which they were created, we did so by reviewing the text of ORS chapter 457. *See Umrein*, 61 Or App at 604; *see, e.g.*, *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (the goal of statutory construction is to discern the legislature's intent by examining the text of the statute in context, along with any helpful legislative history). Williams's arguments do not persuade us that we were mistaken in that assessment. Throughout ORS chapter 457 the separateness of the urban renewal agency from the municipality is emphasized. In stating that urban renewal agencies are "a public body corporate and politic," ORS 457.035, the legislature ensured that those agencies were not merely political subdivisions of the municipalities for which the agency was created. *See* ORS 174.109 ("[A]s used in the statutes of this state 'public body' means state government bodies, local government bodies and special government bodies."). The phrase "a public body corporate and politic" creates a municipal or quasi-municipal corporation in its own

right.[5] That the legislature so intended is supported by the sections of the act that give urban renewal agencies the power, among others, to sue and be sued, to have a seal, to have a perpetual succession, to contract, to make rules and regulations, to acquire (including by condemnation), own, hold, improve and dispose of real property, and to acquire funds and incur indebtedness. *See River Road Water Dist. v. City of Eugene*, 8 Or App 290, 304, 492 P2d 812 (1972) (explaining that entities recognized in Oregon as quasi-municipal corporations are entities "engaged in providing services to people and ha[ve] been given corporate powers by the legislature, including the powers to sue and be sued; to buy, hold and dispose of property; to enter contracts; to make necessary rules and regulations; and to tax" and distinguishing boundary commissions which do not have such corporate powers).

The act also includes other provisions that support the legislature's intention that an urban renewal agency would be separate from the municipality for which it was created. ORS 457.035 creates the urban renewal agencies; they are not created by the municipalities that activate the agency. The statutory definition of municipality emphasizes that, explaining that "the municipality" means "the municipality *for which* a particular urban renewal agency is created." ORS 457.010(10) (emphasis added). ORS 457.045(3) provides that, even if an urban renewal agency is made up of the same members as the governing body of the municipality, the urban renewal agency's actions are independent of the municipality, and ORS 457.035(2) gives urban renewal agencies the power to operate outside of the territorial

---

[5] McQuillin explains:

"Succinctly stated, a municipal corporation is a body politic and corporate, possessing a legal entity and name, a seal by which to act in solemn form, a capacity to contract and be contracted with, to sue and be sued, *a persona standi in judicio*, to hold and dispose of property, and thereby to acquire rights and incur liabilities, with power of perpetual succession, inhabitants and territory. The distinguishing feature of a municipal corporation, or a quasi-municipal corporation, is that it is not only a body corporate but also a body politic, the components of which, the corporators, are endowed with the right to exercise in their collective capacity a portion of the political power of the state."

Eugene McQuillin, 1 *Municipal Corporations* § 2:8 (3d ed 2007) (footnotes omitted).

boundaries of the municipality for which it was created, as provided in ORS 456.060(1). *See also* ORS 457.105 (providing that, if the plan extends into the boundaries of another municipality, that municipality must approve of the plan by resolution). Further, with the exception of substantial amendments, the agency may amend its own plan without approval by the city. ORS 457.220.

As a municipal or quasi-municipal corporation, an urban renewal agency is not merely a political subdivision of the municipality for which it was created; it is its own entity as a matter of definition and by the statutory grant of autonomous power given those agencies in ORS chapter 457. As such, URC is not governed by the city charter—a document that governs the city, *see* Oregon City Charter of 1982—but is governed by ORS chapter 457. That legislative intention of the independence of urban renewal agencies—the purpose of which is to carry out the approved urban renewal plan—is not contraindicated by the role of the city under the statutory scheme to activate the agency, choose the form of the agency, approve the plan and substantial amendments to the plan, or terminate the agency if the statutory requirements for termination are met.

With that initial question resolved, we return to the text of section 59E, which appears in the city's charter and provides:

"After June 30, 2016, the City of Oregon City, the Urban Renewal Agency of the City of Oregon City, or any agency created in whole or in part by the city, whether acting alone or in concert with other persons, entities or agencies:

"(a)   Shall not finance, or authorize the financing of, any urban renewal plan or project, in whole or in part, with tax increment financing revenues.

"(b)   Shall not borrow or spend, or authorize the borrowing or spending of, money to buy land or property for the purpose of urban renewal, or the development of property not owned by the city.

"(c)   Shall use any and all existing tax increment revenues solely for the purpose of retiring existing Urban Renewal Agency debt."

We readily conclude that, with respect to URC, section 59E is expressly preempted by ORS chapter 457. Section 59E purports to direct the actions of URC with respect to tax increment financing, property acquisition, and use of existing revenue in a manner that is incompatible with ORS chapter 457. Under ORS chapter 457, URC is a separate entity from the city, is required to carry out the approved urban renewal plan, and expressly is conferred the powers "[t]o acquire real property, by condemnation if necessary, when needed to carry out the plan," ORS 451.170(3), to acquire funds to carry out urban renewal projects, ORS 457.190, and, as long as the provisions in ORS chapter 457 are met, to use tax increment financing in the plan to fund urban renewal projects, ORS 457.190, ORS 457.220 to 457.470. Section 59E directly conflicts with ORS chapter 457 by purporting to restrict the powers of URC conferred by statute to meet its statutory obligation to carry out the approved urban renewal plan.

We reject Williams's arguments that section 59E and ORS chapter 457 can operate currently, which are based on his premise that a city does not have to authorize an urban renewal agency or authorize the use of tax increment financing by that agency. That argument ignores that section 59E was passed long after the city declared the need for an urban renewal agency and approved a current urban renewal plan for URC to carry out. We do not agree with Williams's assertion that the city charter controls over the urban renewal plan with respect to urban renewal in the city. ORS chapter 457 expressly created urban renewal agencies as independent from the municipalities where they operate and provided a comprehensive legislative scheme for the creation, approval, and substantial amendment of urban renewal plans that the urban renewal agency is required to carry out. Under those circumstances, ORS chapter 457 and section 59E in the city charter cannot operate concurrently. The directive in section 59E purports to direct URC's activities in a manner that "in truth is incompatible with the legislative policy." *LaGrande/Astoria*, 281 Or at 148.

Williams additionally argues that section 59E is not fully preempted, even if it cannot apply to URC directly, because it expresses a policy choice that the city is required

to implement in whatever ways are available to it, such as amending the current urban renewal plan to be consistent with section 59E. We also reject that argument. The plain text of section 59E purports to place direct prohibitions on the city and URC with respect to financing and property acquisition for urban renewal projects or plans, and it took immediate effect upon its passage. However, the city has already approved the urban renewal plan that URC is required to carry out, ORS 457.220, and, in doing so, also committed itself to "assume and complete any activities prescribed it by the urban renewal plan." ORS 457.095(2)(g). Section 59E was not adopted in accordance with any of the provisions of ORS chapter 457 for making a substantial amendment to a plan or terminating urban renewal agencies. At the moment of its passage, section 59E was preempted by ORS chapter 457 because the two laws could not operate concurrently—that is, the city could not abide by the requirements in ORS chapter 457 that apply to it and abide by section 59E.

In addition, we agree with URC that ORS chapter 457 requires that both original plans and substantial amendments to plans must originate with the urban renewal agency to comply with ORS chapter 457. The process in ORS chapter 457 specifically operates in such a way that the process must start with the agency. *See* ORS 457.085 (plan requirements); ORS 457.087 (agency report requirement); ORS 457.089 (review of plan by planning commission and affected taxing districts). In addition, the statute that applies to city approval of plans provides only that a city may approve a plan "upon receipt of a proposed urban renewal plan and report from the municipality's urban renewal agency and after public notice and hearing and consideration of public testimony and planning commission and taxing district recommendations." ORS 457.095 (process for city approval of plan); ORS 457.220 (requiring substantial amendments to follow the same process as original plans); *see also* ORS 457.085(2)(i) (requiring original plan to identify what types of amendments are substantial amendments). ORS 457.095 contemplates that all plans and substantial amendments to plans will originate with the urban renewal agency, a process that is further supported by the statutory

context of the emphasized independence of urban renewal agencies from the municipality, as discussed above. As such, even if, as Williams urges, section 59E could be characterized as a directive to the city to substantially amend URC's plan to effectuate the prohibitions in section 59E, such a directive could not operate concurrently with the required processes set out in ORS chapter 457.

Finally, to the extent that Williams asserts that section 59E applies to prospective urban renewal plans by directing the city not to approve such a plan that is not in conformance with its directives, and thus survives on that basis, we reject the argument. Williams's argument is a request that we sever from the expressly preempted sections of section 59E a small sliver of that section that could be said to operate in the manner proposed by Williams. We are not persuaded by Williams's cursory argument that section 59E can be severed in this manner, given our above conclusions. Nothing in the text of section 59E suggests that it is an effort to shape future approval of urban renewal plans not yet in effect. Rather, the section explicitly seeks to direct the current actions of the city and URC, including with respect to the current indebtedness of URC. To parse out only a prospective directive in one or more of the subsections from section 59E, as urged by Williams, is a request for us to rewrite section 59E, which we will not do. *See Automobile Club v. State of Oregon*, 314 Or 479, 494, 840 P2d 674 (1992) ("When some proposed uses of the emission fee are permissible and some are not, we will not redraft the statute to save the permissible uses.").

Williams also argues that, if section 59E and ORS chapter 457 are in conflict, section 59E controls under the city's home rule authority. The source of the city's home rule authority in this respect is Article XI, section 2, of the Oregon Constitution, which provides:

> "The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]"

The Supreme Court addressed that limit on legislative authority in *LaGrande/Astoria*, which sets out the principles to apply when a local law and state law are in conflict:

> "When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.
>
> "Conversely, a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local community's freedom to choose its own political form. In that case, such a state law must yield in those particulars necessary to preserve that freedom of local organization."

*LaGrande/Astoria*, 281 Or at 156 (footnote omitted).

Williams's argument that ORS chapter 457 is concerned with "the structure and procedures of local agencies" is unavailing because it is premised on the incorrect legal theory, rejected above, that URC is a local agency, *i.e.*, an agency of the city, rather than a public corporation created by statute that is independent of the city. The cases cited by Williams to support his position involved statutes that directed a city or cities to create a board within the city and purported to direct the composition of that board and the power it must exercise. *McGee v. Civil Service Bd. of the City of Portland*, 211 Or App 149, 160, 154 P3d 135 (2007) (holding that Civil Service for Firefighters Act, which "expressly obligates political subdivisions to create civil service commissions and prescribes the form of those commissions, how they are selected, and the powers that they must exercise," violated Article XI, section 2, under *LaGrande/Astoria*); *see also State ex rel Heinig v. Milwaukie et al*, 231 Or 473, 373 P2d 680 (1962) (Article XI, section 2, prohibited application of same Civil Service for Firefighters Act to the City of Portland under pre-*LaGrande/Astoria* case law); *Branch v. Albee*, 71 Or 188, 142 P 598 (1914) (act creating a pension department in cities over 50,000 in population

and directing fees to be used for the fund was an attempt to amend Portland's city charter in violation of Article XI, section 2). As explained above, urban renewal agencies are independent municipal or quasi-municipal corporations from the municipalities where they operate and, thus, the act's creation of those agencies does not impinge on a local government's ability to choose its own political form.

We also reject Williams's suggestion that, because ORS chapter 457 contains provisions related to taxing and borrowing, it necessarily concerns the structure and procedures of local agencies. Again, Williams's argument is premised on the theory that an urban renewal agency is a local agency of the municipality, which we have rejected. To the extent Williams argues that ORS chapter 457 directs any particular taxing or borrowing of the city, we also reject that premise. Any taxing or borrowing that the city takes on as a result of ORS chapter 457 is done through its own approval of the urban renewal plan; it is not imposed by the statutory scheme. With that said, the thrust of Williams's argument appears to be that section 59E is directed at taxing and borrowing of the city and that, if we conclude that ORS chapter 457 preempts section 59E, then ORS chapter 457 implicates "home-rule concerns relating to legislative interference with self governance." However, Williams's frame of the issue is not what *LaGrande/Astoria* directs us to use. We are not assessing whether the local law is concerned with matters of local governance; we are assessing whether the state law is a "general law addressed *primarily* to substantive social, economic, or other regulatory objectives of the state," and if it is, that law "prevails over contrary policies preferred by some local governments if it is clearly intended to do so." *LaGrande/Astoria*, 281 Or at 156 (emphasis added).

We conclude that ORS chapter 457 is a general law "addressed primarily to substantive social, economic, or other regulatory objectives of the state." *Id.* Williams's arguments asserting otherwise are directed at the fact that ORS chapter 457 necessarily is implemented at local levels through urban renewal agencies operating in a local area under a locally approved urban renewal plan, using tax increment financing on local property taxes. However, implementation at a local level is not the defining characteristic

for determining if a state law is addressed to primarily substantive concerns of the state. *See LaGrande/Astoria v. PERB*, 284 Or 173, 184, 586 P2d 765 (1978) (on rehearing, clarifying that "[t]he constitution shows, however, that beyond the limitation on enacting, amending, or repealing charters the legislature did not lose the power to enact purely local laws"); *id.* at 185 (explicitly rejecting proposal that the analysis should be based on weighing local versus statewide interests). Rather, it is a question of whether the state law affects "the authority of the people of a city to choose the organization and political form of their local government." *Springfield Utility Board v. Emerald PUD*, 339 Or 631, 647, 125 P3d 740 (2005).

For example, in *LaGrande/Astoria*, the state law at issue was one that required cities and counties to provide police and firefighters with state retirement and insurance benefits, with the financial burden of obtaining the insurance at the local level, or to provide comparable local benefits. The court concluded that the law was a general law with substantive objectives. The court explained:

> "The provisions for financial security for police officers and firemen and their dependents in the event of retirement, disability, or death address a social concern with the living standards of these classes of workers, not with local governments as such. \*\*\* While the statewide retirement and insurance plans do displace other plans that local agencies have made, or might make, for these objectives, they are not irreconcilable with the freedom to charter their own governmental structures that are reserved to the citizens of Astoria and La Grande by [A]rticle XI, section 2."

*LaGrande/Astoria*, 281 Or at 156-57; *see also Springfield Utility Board*, 339 Or at 647 ("Those statutes do nothing to affect the structure or the form of the city's government and, instead, merely provide a comprehensive, statewide system for allocating service territories to different utility providers.").

ORS chapter 457 is an act primarily concerned with combatting the perceived detrimental social and economic effects of allowing blighted urban areas to persist—areas that necessarily are located within individual

municipalities, but which, on the whole, are about statewide concerns. The text of the act supports that it is directed at statewide concerns, accomplished through the creation of independent urban renewal agencies, and does not make changes to the political form of local government. *See City of Roseburg v. Roseburg City Firefighters*, Local No. 1489, 292 Or 266, 277-78, 639 P2d 90 (1981) (discussing the difference between "legislated organization of local government and legislated organization of state government which affects local government" of which the former is "addressed to a concern of the state with the structure and procedures of local agencies" and the latter is a substantive statute to be examined for "irreconcilability 'with the local community's freedom to choose its own political form'" (quoting *LaGrande/Astoria*, 281 Or at 156)). Although not conclusive on the issue because they are not operative directives in the statutes, the legislative findings in ORS 457.020 provide context that supports our understanding of ORS chapter 457. *See Gunderson, LLC v. City of Portland*, 352 Or 648, 661, 290 P3d 803 (2012) (referring to legislative findings contained in the statute as statutory context that supported court's reading of operative provisions). In ORS 457.020, the legislature set out the statewide social and economic effects of blighted areas and expressed a policy of the state to address those effects through urban renewal activities by a public agency. ORS 457.020.[6] Further, ORS chapter 457 is not irreconcilable "with the local community's freedom to

---

[6] ORS 457.020 provides:

"It hereby is found and declared:

"(1) That there exist within the state blighted areas.

"(2) That such areas impair economic values and tax revenues.

"(3) That such areas cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the state and that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health, safety and welfare, fire and accident protection and other public services and facilities.

"(4) That certain blighted areas may require acquisition and clearance since the prevailing condition of decay may make impracticable the reclamation of the area by conservation or rehabilitation, but other areas or portions thereof may be susceptible of conservation or rehabilitation in such manner that the conditions and evils mentioned in subsections (1), (2) and (3) of this section may be eliminated, remedied or prevented and that such areas should, if possible, be conserved and rehabilitated through appropriate

choose its own political form." *LaGrande/Astoria*, 281 Or at 156. Thus, under *LaGrande/Astoria*, we conclude that ORS chapter 457 prevails over the "contrary polices preferred" by the city, as enacted in section 59E. *Id.*

On appeal, affirmed; on cross-appeal, dismissed as moot; motion to dismiss cross-appeal dismissed as moot.

---

public action and the cooperation and voluntary action of the owners and tenants of property in such areas.

"(5) That the acquisition, conservation, rehabilitation, redevelopment, clearance, replanning and preparation for rebuilding of these areas, and the prevention or the reduction of blight and its causes, are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern.

"(6) That there are also certain areas where the condition of the title, the diverse ownership of the land to be assembled, the street or lot layouts or other conditions prevent a proper development of the land, and that it is in the public interest that such areas, as well as blighted areas, be acquired by eminent domain and made available for sound and wholesome development in accordance with a redevelopment or urban renewal plan, and that the exercise of the power of eminent domain and the financing of the acquisition and preparation of land by a public agency for such redevelopment or urban renewal is likewise a public use and purpose.

"(7) That redevelopment and urban renewal activities will stimulate residential construction which is closely correlated with general economic activity; that undertakings authorized by this chapter will aid the production of better housing and more desirable neighborhood and community development at lower costs and will make possible a more stable and larger volume of residential construction, which will assist materially in maintaining full employment.

"(8) That the necessity in the public interest for this chapter is a matter of legislative determination."